**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Fred SULLIVAN, Nick Panaccione, Lazarro Louis Martos, Antonio Nilo Maldonado, Severo Pascual Martinez, Orlando Maldonado, Defendants-Appellants.**

No. 83–5493.

United States Court of Appeals, Eleventh Circuit.

June 21, 1985.

Craig R. Wilson, Ruffolo & Wilson, West Palm Beach, Fla., for defendants-appellants.

Michael J. Doddo, Plantation, Fla., for Panaccione.

Marco De La Cal, Miami, Fla., for Martos.

Stanley Marcus, U.S. Atty., Linda Collins-Hertz, Jon May, Asst. U.S. Attys., for plaintiff-appellee.

Steven Kollin, Coconut Grove, Fla., for Maldonado.

Emilio De La Cal, Miami, Fla., for Martinez.

Mitchell Denker, Michael S. Gilbert, Key West, Fla., Ronald Dion, N. Miami Beach, Fla., for Orlando Maldonado.

Before HENDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Appellants appeal from their convictions on various drug and weapons charges. The specific offenses of which appellants were found guilty are as follows:

Count I: Conspiracy to import marijuana: Sullivan, Orlando Maldonado.

Count 2: Conspiracy to possess with intent to distribute in excess of 1,000 pounds of marijuana: Panaccione, Orlando Maldonado, Martinez, Antonio Maldonado, Martos.

Count 3: Carrying a firearm during the commission of a felony: Orlando Maldonado.

Count 4: Carrying a firearm during the commission of a felony: Martinez.

In addition to the appellants, Harry Abernathy was found guilty on counts 1 and 2, but his appeal has been dismissed. Roberto Perez was convicted of count 2, but his appeal has also been dismissed. Thomas Ruzzano was indicted with appellants but tried separately, and found guilty on counts 1 and 2. He has not appealed his conviction. Dalton Whaley was also indicted with appellants. He pled guilty to count 1, and the government subsequently dismissed counts 2 and 3 as to Whaley. Whaley testified for the government in this case.

## I. STATEMENT OF THE CASE

The evidence at trial would warrant the jury's finding of the following facts:

In late 1982 or early 1983, Abernathy told Whaley that he needed a plane and pilot to pick up a load of marijuana in Colombia and fly it to the United States. Abernathy offered Whaley half of the $40,-000 to $45,000 he was to receive for arranging the deal. Whaley agreed to look around for someone who could provide the needed plane and pilot.

Whaley got in touch with Sullivan who agreed to approach someone named Clark who could provide these items. Sullivan then called Clark Thompson, a government informant, and asked him to provide a plane and pilot to transport 5,000 pounds of marijuana from Colombia. Thompson responded that he would get back in touch at a later time.

A few days later, Sullivan told Whaley that Clark could provide the plane and pilot. Whaley agreed to meet Sullivan and Clark in a lounge in Boca Raton, Florida. At that meeting, both Sullivan and Whaley emphasized to Thompson that time was of the essence in providing a plane.

In a subsequent meeting in the lounge, Thompson introduced DEA agent Ernest Batista to Sullivan and Whaley as the man who could provide the equipment for transporting the marijuana. Abernathy then joined the meeting and Batista was introduced to him as someone who could provide airplanes. Abernathy stated that he needed a plane to transport 5,000 pounds of marijuana from Colombia to Texas and offered to pay Batista $135,000 for the job.

Agent Batista next met with Abernathy on January 17, 1983, at a restaurant. With Batista was Agent Charles Overstreet who was posing as a pilot. During the meeting, there was extended discussion of the venture to import marijuana. Over the next two weeks Batista, sometimes accompanied by Overstreet, had numerous meetings and recorded telephone conversations with Abernathy and Ruzzano. These discussions resulted in the undercover agents fly-

ing Abernathy and Ruzzano on January 28, 1983, to observe a remote airstrip in central Florida where the marijuana would allegedly be offloaded. During the flight, Ruzzano informed the agents that a man named Orlando would accompany Overstreet to Colombia. It was agreed that the flight would occur on January 31 or February 1. Abernathy gave the agents $3,000 in expense money.

At a final meeting on January 31, Abernathy and Ruzzano told the agents that Orlando would meet them the following morning at Ft. Lauderdale International Airport. According to Ruzzano, persons whom he identified as "Orlando's drivers" would wait for the marijuana at a hotel near the landing strip. These drivers would be responsible for delivering the vans containing the marijuana offloaded from the airplane to various points. Other persons would be responsible for meeting the airplane and offloading the marijuana into the vans.

The following day Batista drove to Ft. Lauderdale Airport. Soon after, Overstreet landed in a twin engine aircraft. Abernathy, Ruzzano, Whaley, and Orlando Maldonado arrived, the latter being introduced as the money men who would accompany Overstreet to Colombia. Panaccione drove up a few minutes later and delivered an envelope to Ruzzano. This envelope contained part of the money which Ruzzano and Abernathy had agreed to pay Batista for the use of his pilot and aircraft.

Shortly thereafter, Orlando Maldonado boarded the aircraft with Overstreet. They took off and flew to Opa Locka Airport, purportedly to transfer to a larger aircraft. Upon landing, however, Maldonado was arrested. He was carrying Baretta pistols.

Meanwhile, Panaccione and Whaley left the airport to rent some vans for use during the offload. Batista left with Abernathy and Ruzzano and, after Abernathy obtained some additional cash for Batista at a bank, they drove to West Palm Beach.

There, Abernathy, Ruzzano, Whaley, Panaccione, and Batista all gathered at the Ramada Inn. Batista introduced them to agent Gutierrez, who was posing as the manager of the ranch where the offload was to occur. Gutierrez had rented a room where the group could wait pending contact with Orlando Maldonado's drivers and departure for the offload site.

Abernathy, Ruzzano, Whaley, Panaccione, and the two agents proceeded to the motel room. There, Ruzzano stated that Orlando Maldonado's drivers would arrive that afternoon and would stay at a nearby hotel. They would be supplying several vans which Ruzzano and the group would use to offload the airplane. Ruzzano stated that he would be in charge of counting, weighing, and marking the bales, and the others in that group would help offload the plane and drive the vans. The loaded vans would then be returned to Orlando's drivers. Abernathy would be responsible for paying Batista after the first van was delivered.

Ruzzano then made some phone calls trying to locate Orlando's drivers. Finally, he spoke to someone whom he called Tony and learned that the other drivers would be at a nearby Sheraton Hotel. The four co-conspirators and the undercover agents then departed in Abernathy's car to go meet the other drivers.

Meanwhile, agents stationed at the Sheraton saw Martinez arrive in a blue van, walk over and talk to Martos who was standing by a red van. Martinez and Martos then walked over to Perez and Antonio Maldonado. All four then walked around the lot for approximately five minutes. Perez and Antonio Maldonado then got in the car and left. When the four alleged co-conspirators and the two agents arrived at the Sheraton, Ruzzano left the car and walked up to Perez and Antonio Maldonado. Abernathy saw Maldonado and said, "There's Tony."

Shortly thereafter, the agents observed Martos and Martinez walking through the

parking lot. The two men looked in Abernathy's car,[1] and then walked over to the blue van. One of them opened the van, retrieved a small handbag,[2] and then walked inside the hotel.

A few minutes later, Ruzzano returned to the car carrying two decks of playing cards on one of which was written the numbers of the rooms rented by Perez, and two sets of keys. Ruzzano gave one set of keys to Whaley who tried them and found that they worked on the red van. Ruzzano then directed Panaccione to the blue van.

At this point, appellants were arrested. Martos and Martinez were arrested in the hotel. Martinez was carrying a small handbag similar to the one Martinez or Martos had earlier removed from the van. The bag contained a Colt .45 automatic. Martinez also had a receipt for the purchase of a Colt .45 on his person.

When an agent approached Perez and asked his business at the hotel, he answered that he had been traveling from New Jersey to Miami and stopped at the hotel. A traffic ticket found in the Perez's car reflected that it had been issued on the previous day to Orlando Maldonado driving that same car in Miami.

Following the arrest, Abernathy's yacht was searched. Ruzzano's briefcase was seized there and found to contain a card on which was written the name "Tony" and a telephone number for Antonio Maldonado.

## II. ISSUE

A careful study of the record convinces us that the only issue that warrants our discussion on appeal is Martos's contention that there was insufficient evidence to convict him of conspiracy. We affirm all of the other convictions.

1. The government's brief states: "Martos and Martinez *stared at the occupants* in Abernathy's car and walked over to a blue van (TV 44(449))." (Emphasis supplied).

 Actually the transcript reference says: "Mr. Martinez and Mr. Martos walked by us and looked directly in the car as I was staring at it."

## III. DISCUSSION

### A. *Sufficiency of the Evidence on the Conspiracy Counts*

 Martos claims that there is insufficient evidence to support his conviction on the conspiracy count. The applicable legal standards are clear. This Court must consider all of the evidence and draw all reasonable inferences in favor of the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The standard of review is whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir., Unit B, 1983) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *United States v. Pintado*, 715 F.2d 1501, 1503 (11th Cir.1983). The government must prove that the defendants engaged in a conspiracy. To prove a conspiracy, the government must prove that the conspiracy existed, that the defendants knew of it, and that with knowledge, they voluntarily joined it. *United States v. Rogers*, 701 F.2d 871, 873 (11th Cir.1983); *United States v. Badolato*, 701 F.2d 915, 919–20 (11th Cir.1983). Mere presence is insufficient to establish knowing participation in a conspiracy, *United States v. Rozen*, 600 F.2d 494, 497 (5th Cir.1979), as is mere association with conspirators, *United States v. Correa-Arroyave*, 721 F.2d 792, 796 (11th Cir.1983). Participation in a conspiracy may, however, be proved by circumstantial evidence, *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir.), *cert. denied*, 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982).

 Appellants cite numerous cases in which convictions have been overturned for insufficient evidence, including *United States v. Littrell*, 574 F.2d 828, 831 (5th Cir.1978) (evidence that defendant drove car to drug pickup, spoke to dealer, then

2. The government's brief says: "Martos and Martinez opened the van, retrieved a small handbag, and returned to the hotel." Following objection of Martos's counsel, Gutierrez testified that he could not say which of the two had opened the door or retrieved the handbag.

went in bar while dealer got drugs from car held insufficient); *United States v. Rozen*, 600 F.2d 494 (5th Cir.1979) (evidence that defendant was found sleeping in woods next to his brother who had been driving a nearby truck loaded with marijuana held insufficient); *United States v. Pintado*, 715 F.2d 1501, 1505 (11th Cir.1983) (evidence that defendant found hidden in house following a raid of an offloading operation outside held insufficient); *United States v. De Simone*, 660 F.2d 532 (5th Cir., Unit B, 1981) (evidence that defendants associated with co-defendants, were present at landing site of plane loaded with marijuana, and attempted to flee held insufficient); *United States v. Alfrey*, 620 F.2d 551 (5th Cir.1980) (evidence that defendant was found hiding on trailer loaded with marijuana during search by Customs officials held insufficient).

The government responds that in those cases the government was unable to show that the defendant was aware of the criminal actions going on around him. It contends that in this case, the government has shown that the appellants were tied to known conspirators and that the statements of the co-conspirators outlined the role to be played by the appellants. The government contends that Martos, Martinez, and Antonio Maldonando were an integral part of the scheme because they were the ones responsible for the ultimate distribution of the narcotics. It contends that *Littrell, Alfrey, Rozen,* and *De Simone* can also be distinguished because they were decided under the erroneous standard of review used prior to *Bell, i.e.,* that the evidence must be inconsistent with every reasonable hypothesis of innocence.

The direct evidence involving defendant Martos may be briefly summarized. DEA agents saw Martos in the Sheraton parking lot near a red van. Martinez arrived in a blue van and walked over to Martos. Martos and Martinez walked over to Perez and Antonio Maldonado, and all four walked around the parking lot for about five minutes. Martos and Martinez went to the blue van and one of them removed a small bag from the van. The two then went into the Sheraton lounge. Agent Osleber testified that he arrested all Latin-looking males in the Sheraton lounge, including Martos. When Martos was arrested, he was with Martinez who was carrying a small handbag which was found to contain a pistol. The government contends that this direct evidence must be considered in the context of statements by Ruzzano that the conspirators were going to the Sheraton lot to meet "Orlando's drivers" who were to distribute the marijuana. There was no evidence as to who the drivers were expected to be.

This evidence was totally insufficient to support the conviction of Martos. There is no evidence that Martos knew of the existence of the conspiracy or that he knew that the van was to be used to transport marijuana. Nor was there evidence that he knew of the existence of the pistol that the jury could find had been removed from the blue van driven by Martinez. His conviction seems to be based totally on his presence at the scene in the Sheraton parking lot. He was not observed doing anything from which the jury could draw an inference that he was a member of the conspiracy.

### IV. CONCLUSION

The judgment of conviction and sentence of Martos is REVERSED and all other judgments are AFFIRMED.