UNITED STATES of America, Plaintiff–Appellee,

v.

Jose Alfredo VILLEGAS, Jairo Rendon, Rodrigo Rendon, Defendants–Appellants.

UNITED STATES of America, Plaintiff–Appellee,

v.

Jose VILLEGAS, Defendant–Appellant.

Nos. 88–5385, 88–5804.

United States Court of Appeals, Eleventh Circuit.

Sept. 12, 1990.

Theodore J. Sakowitz, Federal Public Defender, Bruce J. Kessler, Asst. Federal Public Defender, Miami, Fla., for Jairo and Rodrigo Rendon.

Richard M. DeMaria, Miami, Fla. (Court Appointed), for Villegas.

Dexter W. Lehtinen, U.S. Atty., Lynne W. Lamprecht, Linda C. Hertz, Mayra R. Lichter, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Jose Villegas, Marianna, Fla., pro se.

Before KRAVITCH, Circuit Judge, RONEY * and ALDISERT **, Senior Circuit Judges.

ALDISERT, Circuit Judge:

Appellants Jose Alfredo Villegas, Rodrigo Rendon and Jairo Rendon were indicted by a federal grand jury in the Southern District of Florida for conspiring to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 (Count I) and for possession with intent to distribute and distribution of at least five kilograms of cocaine, in violation of 18 U.S.C. § 841(a)(1) (Counts II and III). After a jury trial Rodrigo was found guilty on all counts and sentenced. His brother, Jairo, was convicted and sentenced on the conspiracy count only. Villegas entered a guilty plea and was thereafter sentenced.

In case No. 88–5385 we must decide whether there was sufficient evidence to support the convictions of appellants Rodrigo and Jairo Rendon. In case No. 88–5804 we must decide whether the district court correctly exercised its discretion in denying appellant Villegas' request for reduction of sentence under Rule 35(b) Fed.R.Crim.P. Villegas first appealed from the final judgment and commitment order and filed a pro se brief which was docketed at No. 88–5385. After appealing, Villegas also wrote a letter to the sentencing judge which the judge treated as a modification of sentence

pursuant to Rule 35(b) Fed.R.Crim.P. Although his letter is not of record, the request was denied. Villegas filed substantially the same brief in his second appeal, docketed at No. 88–5804 as he did at No. 88–5385. We have considered these separate Villegas' appeals as consolidated.

The district court had proper jurisdiction and this court has jurisdiction under 28 U.S.C. § 1291. Appeal was timely filed under Fed.R.Crim.P. 4(b).

I.

On August 28, 1987, around 2:00 or 2:30 p.m., a professional cocaine dealer turned informant, Humberto Prieto, went to the office of Sergio Betancourt and Juan Etayo with undercover Ft. Lauderdale, Florida police detective, Tom Tiderington, posing as an alleged buyer, to discuss a proposed deal involving 17 kilograms of cocaine. The price agreed upon was set at $16,000 per kilogram. Several minutes into the discussion, Jose Villegas arrived, as planned, and took over the initiative of the conversation. The group agreed that when Villegas saw the money offered by the buyers, he would send for the cocaine. The group then dispersed.

When Prieto and Tiderington returned to the office around 6:00 p.m., Etayo and Betancourt were present. Villegas then arrived with Juan Duque. The participants agreed on the following plan: Detective Tiderington would supply a vehicle to Villegas; Villegas would then send someone with it who would load the cocaine into the car and park it in an undisclosed location; Detective Tiderington would then go to his car for the purpose of examining the cocaine; meanwhile the money would remain with Tiderington's friend at or near the Betancourt/Etayo office. When satisfied, Tiderington would telephone his partner and the money would be released.

In acting out the planned scenario, Tiderington left the office and went to the park-

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Ruggero J. Aldisert, Senior U.S. Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

ing lot where Detective Anderson was stationed with money. Tiderington then returned to the room with $300,000 in cash. Villegas then went into a separate office with Tiderington to count the money. Satisfied that the money was there available, Villegas dispatched Duque to drive Detective Tiderington's tan Toyota for the purpose of loading the cocaine.

Fort Lauderdale detectives followed the tan Toyota from the real estate office until its arrival at the home of Rodrigo Rendon. Duque was instructed by Villegas to obtain the cocaine from Rodrigo Rendon and put it in the trunk of Tiderington's car. Arriving at the house, Duque spotted Jairo Rendon standing outside the house. Jairo had the hood of his black Pontiac open and was drinking some whiskey while bent over the open engine, ostensibly working on the car. Duque said nothing to Jairo Rendon. Rodrigo Rendon opened the garage door and Duque brought the car into the garage, and closed the garage door. According to Duque, Rodrigo Rendon then brought the cocaine to Duque in a blue bag.

Duque and Rodrigo Rendon agreed that Rodrigo would follow Duque in a red Toyota van belonging to Villegas. Rodrigo then asked his brother, Jairo, to follow him in Jairo's Pontiac to the Hollywood Mall, where Duque would take the van and Jairo Rendon would pick up his brother. The three cars—Tiderington's tan Toyota, Villegas' red Toyota van, and Jairo's black Pontiac—then drove to the Hollywood Mall.

Upon arrival at the mall parking lot, Duque parked the tan Toyota and then went to look for the red van. Duque saw Rodrigo Rendon walking in the lot towards the mall building, but Duque did not see Jairo Rendon. Duque then returned the red van back to the real estate office.

Villegas then sent Duque back to the Hollywood Mall with Tiderington so that Tiderington could view the cocaine as agreed. They arrived at the mall a short time later and walked over to the Toyota. Duque opened the trunk, and Tiderington observed 17 yellow packages. Tiderington told Duque he was satisfied and they closed the trunk and walked away from the car toward the mall to make the telephone call in order to release the money.

Rodrigo and Jairo Rendon were standing in the parking lot near the mall and watched as Duque and Detective Tiderington looked into the trunk of the tan Toyota. As Tiderington and Duque walked toward the mall building, Jairo and Rodrigo Rendon walked to the black Pontiac which had been parked a few spaces away from the tan Toyota. The hood of the Pontiac was raised and both Jairo and Rodrigo watched Tiderington and Duque enter the building. In Agent McManus' opinion, the Rendons were counter-surveilling the area.

Officers then arrested Duque inside the building and arrested the Rendons near the black Pontiac. At the time of his arrest, Jairo had the keys to the black Pontiac. The police said that a portable telephone was found in this car. Agent McManus took the keys and started the Pontiac's engine without any difficulty. After receiving Tiderington's telephone call, special agent Anderson went into the real estate office with other agents who arrested Etayo and appellant Villegas.

### II.

Both Jairo and Rodrigo Rendon took the stand in their own defense. Jairo testified that Rodrigo had bought a house from Alfredo Villegas on August 27 and he and Rodrigo had celebrated its purchase that evening at the new house with Villegas and Duque. He said that Villegas came to his house in a red van and Duque arrived in a blue one, but they had left the two vans there when they went home because they had too much to drink. Jairo said that the next morning he and Rodrigo used the red van to move to the new house and that they had been together the whole day; Rodrigo had never gone to the real estate office.

Jairo testified that at about 6:00 p.m. on August 28, he had been tuning his brother's black Pontiac when Duque drove into the yard. He stated that Duque had backed his car into a slot in the yard between the two vans, opened the trunk, and

appeared to be moving something, but Jairo could not see what it was. Jairo stated that Duque had not taken his car into the garage. He also denied going to the street and looking both ways as the government alleged at trial. Jairo further testified that Rodrigo had asked him to follow him to the Hollywood Mall, but he denied that he had been following Duque or that Duque's leaving had anything to do with Jairo leaving. Jairo further testified that his brother, Rodrigo, had been having problems with the black car and that when they had arrived at the mall, it had overheated, so they had lifted the hood and left the car in the parking lot to cool off for about forty minutes. Jairo denied that he had been doing any counter-surveillance at the mall or that he had been involved in any drug deal with Duque and Villegas. Jairo also said that he had never seen the portable telephone Agent McManus had found in the black Pontiac, and that he and his brother did not have a portable telephone in the car.

Rodrigo Rendon also denied ever having dealt with cocaine or having driven with Villegas in his red van to the real estate office in Hollywood. He denied having been with Duque and Villegas at all on the day of his arrest. Like Jairo, Rodrigo testified that he had been having problems with his black car overheating. Rodrigo admitted, contrary to Jairo, that he had been following Duque when he drove the red van to the mall. He said that he had asked Jairo to follow him. He denied having left the keys to the red van in it for Duque, and he said he did not know where in the mall Duque had parked the tan Toyota. His testimony was that he had lost sight of Duque when he drove into the mall, but met him on foot at the entrance to the mall and had handed him the keys to the red van there.

### III.

After a jury trial, Rodrigo Rendon was convicted of all the charges in the indictment and sentenced to 18 years imprisonment on each count, to run concurrently. A supervised release term for Counts II and III was also imposed for a term of five years and he was given a $150 special assessment. Jairo Rendon was convicted of the conspiracy charge contained in Count I of the indictment, but acquitted of all the charges contained in Counts II and III. He was sentenced to 12 years imprisonment and ordered to pay a $50 assessment.

■ Both Rodrigo and Jairo Rendon contend that there was insufficient evidence to support their convictions. The standard of review as to the sufficiency of the evidence is whether the evidence, when considered in the light most favorable to the government, proved the appellant guilty beyond a reasonable doubt. *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). For the government to satisfy its burden of proof at trial, it was required to show knowing participation by Rodrigo and Jairo.

### A.

■ We are satisfied that the government demonstrated Rodrigo's knowing participation in the cocaine transaction beyond a reasonable doubt. The evidence showed that he agreed to supply Villegas with the 17 kilograms of cocaine needed by Villegas for his transaction with Betancourt and Etayo. Rodrigo borrowed Villegas' red van to help effectuate the cocaine transfer. He waited for Villegas' messenger Duque to arrive at his house to pick up the cocaine, and the transfer of 17 kilograms of cocaine actually occurred in the closed garage attached to Rodrigo's house.

In addition, Rodrigo followed Duque to the mall in Villegas' red van so that Duque could leave the cocaine in the Hollywood Mall in the trunk of a tan Toyota, while he took the red van back to pick up the buyer and bring him back to inspect the cocaine. This evidence is more than sufficient for a reasonable jury to convict Rodrigo for his role in the conspiracy and for the substantive crimes of possession with intent to distribute cocaine.

### B.

■ The evidence against Jairo is less solid. The evidence the government elicited at trial hinged upon Jairo Rendon's relationship with his brother Rodrigo Rendon and Jairo's presence near the transactions. The worst case scenario against Jairo can be described as follows: He was seen by Duque in front of his brother Rodrigo's home; several surveillance officers who observed Jairo walk out of the house and look to his left and to his right offered the opinion that this constituted counter-surveillance. Jairo drove the Pontiac and followed his brother and Duque to the Hollywood Mall, where he parked his car, put up the hood, and walked inside the mall building where he remained for 40–45 minutes until he was arrested. Jairo claims that the hood of the car was raised because it was overheated. The government responds that because the car started without difficulty, Jairo's story is implausible.

According to the government, the most damaging evidence against Jairo is the charge that he was engaged in counter-surveillance activity, that this demonstrated a knowing participation in the conspiracy and, therefore, was proven beyond a reasonable doubt. We disagree.

■ We are not persuaded that the evidence establishes the personal involvement or knowing participation of Jairo Rendon in the conspiracy. Our beginning point is the teaching of *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) (citations omitted): "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. . . . Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" Where the government seeks to meet its burden of proof on the basis of circumstantial evidence, however, it must rely on reasonable inferences in order to establish a prima facie case.

■ In a criminal case, although certain portions of evidence may be introduced to present *permissible* inferences, the sum to-

tal must amount to a *reasonable* inference of the ultimate fact of defendant's guilt. Thus, the ultimate issue in a civil case based on circumstantial evidence is the ability to draw a reasonable inference, and not a speculation, of liability. In a criminal case, the ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt.

[Moreover, t]he court's role is especially crucial when, as here, the [government's] case, and therefore defendant's [guilt] is based solely on circumstantial evidence. The illegal action must be inferred from the facts shown at trial. Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts.

When a trial court grants a directed verdict in a circumstantial evidence case, the court makes a legal determination that the narrative or historical matters in evidence allow no permissible inference of the ultimate fact urged by the opposing party. It decides that no reasonable person could reach the suggested conclusion on the basis of the hard evidence without resorting to guesswork or conjecture. To permit a jury to draw an inference of the ultimate fact under these circumstances is to substitute the experience of logical probability for what the courts describe as "mere speculation."

*Edward J. Sweeney & Sons, Inc., v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *see also* definition of "inference," R. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 28–33 (Clark Boardman 1989). We have recently reiterated what was said in *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983):

It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, pro-

vided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Hardy,* 895 F.2d 1331, 1334 (11th Cir.1990).

 Hearkening to these precepts, this court has established a line of cases that emphasizes the government's threshold obligation to meet basic requirements of proof in drug conspiracy cases: Mere presence is insufficient to establish knowing participation in a conspiracy, *United States v. Sullivan,* 763 F.2d 1215, 1218 (11th Cir. 1985), as is mere association with conspirators, *United States v. Correa–Arroyave,* 721 F.2d 792, 796–797 (11th Cir.1983).

The difficult question is to decide what is required more than mere presence at the scene of an overt activity conducted in furtherance of the conspiracy or mere association with one of the conspirators. We have never painted a bright line perimeter to stake out the distinction between culpable and non-culpable conduct, but for guidance we can resort, in a paraphrase of Lord Diplock, to "the cumulative experience of the judiciary." We will analogize to those cases where this court has found the evidence lacking to sustain a conspiracy connection in drug cases.

Thus, in *Hardy* the following evidence was deemed insufficient: The defendant regularly hosted parties attended by drug users and suppliers, frequently consumed cocaine, helped a conspirator purchase a one-eighth ounce for their joint personal use, and gave a small amount of cocaine to a house guest. 895 F.2d at 1334–1335. We considered a very similar case to one before us in *United States v. Sullivan,* 763 F.2d 1215 (11th Cir.1985). In *Sullivan,* the defendant Martos contended that there was insufficient evidence to convict him of conspiracy. We summarized the evidence:

> DEA agents saw Martos in the Sheraton parking lot near a red van. Martinez arrived in a blue van and walked over to Martos. Martos and Martinez walked over to Perez and Antonio Maldonado, and all four walked around the parking

lot for about five minutes. Martos and Martinez went to the blue van and one of them removed a small bag from the van. The two then went into the Sheraton lounge. Agent Osleber testified that he arrested all Latin-looking males in the Sheraton lounge, including Martos. When Martos was arrested, he was with Martinez, who was carrying a small handbag which was found to contain a pistol. The government contends that this direct evidence must be considered in the context of statements by Ruzzano that the conspirators were going to the Sheraton lot to meet 'Orlando's drivers' who were to distribute the marijuana.

*Sullivan,* 763 F.2d at 1219.

Evaluating the evidence, this court stated:

> This evidence was totally insufficient to support the conviction of Martos. There is no evidence that Martos knew of the existence of the conspiracy or that he knew the van was to be used to transport marijuana. Nor was there evidence that he know of the existence of the pistol that the jury could find had been removed from the blue van driven by Martinez. His conviction seems to be based totally on his presence at the scene of the Sheraton parking lot. He was not observed doing anything for which a jury could have drawn inference that he was a member of the conspiracy.

*Id.* at 1219.

In the recent case of *United States v. Hernandez,* 896 F.2d 513 (11th Cir.1990) *petition for cert. filed,* (No. 90–5033) (July 2, 1990), we held that the following was insufficient evidence to convict Hector Giral of drug conspiracy:

> Essentially, the government's case against Giral consists of Giral's presence in Aquino's car and at the trunk when Aquino delivered the package to Garcia, Giral's walking away after catching Garcia's eye, Giral's talking to a dead phone, and Giral's prior conviction of cocaine possession.... Yet Giral's mere association with Aquino or presence at the transaction does not prove that he was a part of the conspiracy. Even in conjunc-

tion with his "flight" to Burger King Giral's presence cannot support a conspiracy conviction.

896 F.2d at 519.

In *United States v. Pintado*, 715 F.2d 1501 (11th Cir.1983), we held as insufficient evidence that the defendant was found hiding in a closet, clothed in pants and a shirt, in a bedroom of a house where off-loading of marijuana was taking place. The court analogized to *United States v. DeSimone*, 660 F.2d 532 (5th Cir., Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), where the following evidence was held to be insufficient:

> In *DeSimone* appellant and several co-defendants were arrested in the vicinity of an airplane which had landed at a secluded airport in the early morning hours laden with marijuana. The defendant was identified as one who had been in the presence of several other defendants the preceding afternoon. The preceding week some of the codefendants rented two trucks, a trailer, a van, several skate conveyors, and two automobiles. Several of the defendants had registered as a group in a Quality Inn motel; all rooms paid for in cash by one of the defendants and registered in the name of a fictitious land development company.
>
> Customs agents and police officers, after receiving a tip, corralled the airplane loaded with marijuana, arrested a codefendant in a tractor-trailer and another in a fuel truck, both near the plane, and apprehended DeSimone and other defendants in the vicinity of one of the rented cars which had been ditched on the road leaving the airport.

*Pintado*, 715 F.2d at 1504 n. 3.

From this cumulative experience, we acquire guidance. This experience informs us as to where to draw the line between insufficiency and sufficiency of evidence. To be sure, staking out the line's contours cannot be a precise science because a value judgment is involved. From Max Weber, the important European legal theorist, we learn that a value judgment refers to the practical evaluation of a phenomenon which is capable of being "worthy of either condemnation or approval." He distinguished between "logically determinable or empirically observable facts" and "value judgments which are derived from practical standards, ethical standards or ... views." Weber, "Value Judgments in Social Science," in *Weber Selections*, 69 (W. Runciman, ed. 1987).

Deciding what is or is not sufficient evidence is always a difficult chore and it becomes even more so when the factual backdrop consists of a reprehensible traffic in pernicious narcotics. But the presumption of innocence remains constant, irrespective of the heinous nature of condemned activity, as does the requirement that the government prove its case beyond a reasonable doubt, notwithstanding the presence of mere suspicion and speculation.

Although we recognize that reasonably-minded judges can disagree in drawing the line between sufficient and insufficient evidence, as witnessed by the thoughtful dissenting opinion of Judge Roney, we conclude that the same rule of law should apply here as in *Hardy, Sullivan, Hernandez, Pintado* and *DeSimone*.

The conspiracy count hinges on Jairo's relationship with his brother Rodrigo. Knowing participation in a conspiracy, however, cannot be proved solely by a family relationship or other types of close association. See *United States v. White*, 569 F.2d 263 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Gutierrez*, 559 F.2d 1278 (5th Cir.1977); *United States v. Oliva*, 497 F.2d 130 (5th Cir.1974).

### C.

We are constrained to question the premise that anchors the dissenting opinion: "This Circuit had long ago rejected the mere presence defense when the evidence would indicate that drug dealers would not have tolerated the defendant being present were he not involved." Instead we believe that this court has properly treated this as a problem that turns on the specific facts of each case.

Thus, in each of the cases relied upon by the dissent, there was additional evidence augmenting mere presence. In *United States v. Quintero*, 848 F.2d 154, 156 (11th Cir.1988), this court noted "that Quintero was in sole possession of a large quantity of cocaine contained in the boxes," giving him control over the drugs that defendant Jairo, in the present case, did not have. In *United States v. Cruz–Valdez*, 773 F.2d 1541, 1546–1547 (11th Cir.1985), *cert. denied*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986), this court wrote that "[i]f the evidence establishes that a large quantity of contraband was in plain view or could be smelled or was in a place where a person on a vessel would ordinarily discover it, a jury may reasonably infer a person found in the vessel had knowledge of the contraband." In that case, the vessel was a flagless shrimp trawler but its equipment was inoperative and it was clearly unfit for use as such. There was a single cabin and an unlatched hold where thousands of pounds of marijuana, worth millions of dollars, were stowed. This court held that the totality of the evidence was clearly sufficient to support the defendant's conviction.

In *United States v. Munoz*, 692 F.2d 116, 118–19 (11th Cir.1982), *cert. denied*, 459 U.S. 1221, 103 S.Ct. 1229, 75 L.Ed.2d 463 (1983), this court relied upon *United States v. Freeman*, 660 F.2d 1030, 1036 (5th Cir. Unit B 1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982) (quoting *United States v. De Weese*, 632 F.2d 1267, 1273 (5th Cir.1980), *cert. denied*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981)), and reasoned that " 'the probable length of the voyage, the large quantity of marijuana on board, and the necessarily close relationship between the captain and his crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt.' " This court analogized to previous cases, noting that "[h]ere, again, we have (1) the same lengthy voyage (10 days) as to two of the appellants and (13 days as to the other); (2) the same large quantity of marijuana (46,000 pounds); and (3) the same close relationship between captain and crew inferable from the length of the voyage and the size of the vessel. Thus, under *Freeman*, it seems clear that whatever conspiracy had been concocted by the owner of the vessel and the captain and whichever others of the crew (not testified to) may have been in on the entire deal the government has established a prima facie case of conspiracy to import." In *Freeman*, the "[a]ppellants contend[ed] that mere presence and association [was] insufficient to convict them of conspiracy." This court countered that the "simple response to this argument is that a ten day voyage on a vessel that was bulging with 41,000 pounds of marijuana constitutes much more than 'mere presence' or 'mere association' as those terms have been used by this court."

### D.

Considering the case before us in the light most favorable to the government, the evidence is insufficient to prove that Jairo Rendon knew of the existence of the conspiracy and with that knowledge, joined it. Etayo, a major participant in the drug deal, who pleaded guilty and admitted his involvement, stated that he had never met the Rendons until he was arrested. Duque stated that he had never spoken to Jairo Rendon at all. The evidence proved nothing more than a mere relationship to a conspirator and a mere presence at the scene. This was insufficient to sustain a conviction. We hold that the district court erred in not granting defendant Jairo Rendon's Motion for Judgment of Acquittal.

### IV.

We now turn to the contentions of appellant Villegas. Villegas pleaded guilty on February 22, 1988 to Count I of the indictment charging him with conspiring with others from August 25 until August 28, 1987 to possess with intent to distribute at least five kilograms of cocaine. Villegas' plea was entered pursuant to a plea agreement with the government, in which the United States agreed to dismiss Counts II and III of the indictment at the time of sentencing. Villegas, pursuant to the agreement, stated that he understood and

agreed that the court could sentence him to a maximum term of life imprisonment and a four million dollar fine. R. at 78, 74.

At the time he entered the plea, Villegas stated that he was twenty-six years old. Villegas was then placed under oath. He stated that he wished to plead guilty to knowingly and intentionally conspiring with Rodrigo and Jairo Rendon, Etayo and Duque, to possess with intent to distribute a quantity of cocaine. Villegas also stated that he understood that the court could sentence him to life imprisonment and fine him up to four million dollars.

The government proffered the facts it would prove if Villegas' case went to trial. Villegas agreed that the facts, as proffered by the Government, were essentially correct. It is of no little significance that these same facts were also proved at the Rendons' trial.

At sentencing, when asked if he had any objections to the presentence investigation report, Villegas' counsel stated, "We have corrected whatever differences we have," noting that there had been a difference regarding Villegas' age, since, although Villegas was twenty-six years old on the date of the offense, he had turned twenty-seven as of the date of sentence.

After counsel for Villegas and for the government presented their arguments, the court recited the factors it would consider in imposing sentence. As to Villegas, it explicitly considered his age, that he had no prior conviction, that he entered the United States illegally and that he was involved in a very large scale and sophisticated cocaine transaction involving seventeen kilograms.

The judge then stated, "You are determined by the Assistant United States Attorney and by this judge's review of the facts, and I presided over the trial as to some of the defendants, as one of the most culpable." The court noted, however, that Villegas had expressed remorse and pled guilty, "albeit on the eve of trial," and had apparently tried to better himself while incarcerated.

After taking these factors into consideration, on March 29, 1985, the court determined that appellant should serve 18 years in prison. Villegas filed a Notice of Appeal to this court on April 21, 1988. He contends that the district court erred in denying his request for reduction of sentence under Fed.R.Crim.P. 35(b) and also claims that it was error for the sentencing court to rely, in part, on evidence adduced at the trial of the Rendons in determining his sentence.

■ The standard of review for relief pursuant to Fed.R.Crim.P. 35(b) is whether the district court committed an abuse of discretion. *United States v. Campbell,* 711 F.2d 159, 160 (11th Cir.1983). The standard of review on the second issue is whether the court committed error in relying, in part, on evidence presented at the trial of another in sentencing.

■ Villegas first challenges the accuracy of four statements in his presentence investigation report (PSI): (1) a description of himself as the money man and co-leader of the organization; (2) a description of himself as the source of the cocaine; (3) a description of the cocaine transaction as a sophisticated one due to the amount of cocaine and the fact that counter-surveillance was present; and (4) his age. He also seeks to characterize his role as peripheral. These are his challenges before us, a reviewing court, but neither Villegas nor his counsel singled out any of these alleged inaccuracies, except for his age, during Villegas' sentencing hearing. Villegas can hardly criticize the district court for not ruling on certain challenges if they were not presented to it. Failure to assert these objections to the sentencing court is fatal to asserting these issues to a reviewing court.

Moreover, the statements to which Villegas now lodges this tardy objection were supported by a strong factual basis. The sentencing judge, who had heard the evidence regarding Villegas' activities during the Rendons' trial, determined that Villegas was one of the most culpable participants in a large-scale and sophisticated cocaine transaction. The evidence at trial showed that Villegas had been in charge of handling the money part of the cocaine

transaction for the sellers; he was the source of the cocaine for Betancourt and Etayo; and the cocaine transaction involved both a large amount of cocaine and counter-surveillance activities.

 The statements in the PSI to which Villegas objects are essentially conclusions or opinions which characterize his role and his level of culpability; he does not challenge the accuracy of the actual facts underlying such characterizations. As such, his objections are not cognizable under Rule 32. Accordingly, Villegas presented no valid reason for mitigation of his sentence pursuant to Rule 35(b).

 Nor do we agree with Villegas that it was fundamental error for the sentencing court to rely, in part, on evidence adduced at the Rendon trial in determining his sentence. He relies upon *United States v. Castellanos*, 882 F.2d 474 (11th Cir.1989). In *Castellanos*, we held that it was fundamental error for a sentencing court to rely on testimony adduced at the trial of another to resolve a disputed fact at a sentencing hearing when the record indicates that the defendant made the proper and detailed objection at the sentencing hearing.

The *Castellanos* opinion, however, was recently vacated and superseded by *United States v. Castellanos*, 904 F.2d 1490 (11th Cir.1990). Upon reconsideration we held that evidence presented at the trial of another may be considered for sentencing purposes if the defendant is afforded an opportunity to rebut or cast doubt on its reliability. In the present case, not only was Villegas afforded an opportunity to rebut or cast doubt upon the reliability of the evidence, but as noted before, at the sentencing hearing, Villegas agreed that these facts were essentially correct. That these facts were also recorded in the Rendons' trial was simply coincidental. No testimony was adduced at the sentencing hearing; instead, the facts were simply postulated by the government and were agreed to by Villegas. That *identical* and *unchallenged* facts also appeared in the separate trial of the Rendons did not infect Villegas' sentencing proceeding.

We therefore hold that the district court properly exercised its discretion in denying appellant Villegas' motion for mitigation of sentence, pursuant to Fed.R.Crim.P. 35(b) and Fed.R.Crim.P. 32.

V.

The judgment of the district court as to Villegas and Rodrigo Rendon is AFFIRMED. The conviction of Jairo Rendon is REVERSED.

RONEY, Senior Circuit Judge, concurring in part, dissenting in part:

I concur in all of Judge Aldisert's opinion, except the reversal of the conviction of Jairo Rendon. To prove a circumstantial evidence case in this Circuit, it is not necessary to exclude every reasonable hypothesis of innocence. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We have had enough of these cases to know that drug dealers use look-outs. The jury knew this. Assuming Jairo to be a look-out, it is not clear what he would have done that he did not do, or what more evidence one might expect. This Circuit has long ago rejected the mere presence defense when the evidence would indicate that drug dealers would not have tolerated the defendant being present were he not involved. *United States v. Quintero*, 848 F.2d 154, 156 (11th Cir.1988); *United States v. Cruz–Valdez*, 773 F.2d 1541, 1547 (11th Cir.1985), *cert. denied sub nom. Ariza–Fuentas v. United States*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *United States v. Munoz*, 692 F.2d 116, 118–19 (11th Cir.1982), *cert. denied*, 459 U.S. 1221, 103 S.Ct. 1229, 75 L.Ed.2d 463 (1983); *United States v. Freeman*, 660 F.2d 1030, 1036 (5th Cir. Unit B 1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982). I think there was enough evidence to support the jury decision that Jairo was guilty of the offense for which he was convicted.