KRAVITCH, Circuit Judge,
concurring in part and dissenting in part,
I concur in the majority opinion with the exception of section 3.c. (the court’s affir-mance of Count 3, conspiracy to commit murder), from which I respectfully dissent. In my view, the Government failed to present evidence sufficient to prove beyond a reasonable doubt that Hernandez agreed to participate in a conspiracy, the object of which was to shoot down BTTR planes over international airspace, resulting in the deaths of several pilots.

I. Facts

Brothers to the Rescue (“BTTR”) repeatedly and knowingly had violated Cuban airspace since 1994. Jose Basulto, BTTR’s founder and leader, testified that on April 17, 1994 he flew with Bernadette Pardo — a television news reporter — close to the coast of Cuba. Consistent with BTTR’s customary practice, a few other BTTR aircraft accompanied Basulto’s plane. The news reporter videotaped the flight and portions were played for the jury.
The videotape showed a Cuban military aircraft “MiG” circle the BTTR planes and fly in front of Basulto’s. Basulto radioed the MiG pilots, stating, “On behalf of the Cuban exiles, the group that makes the work of Brothers to the Rescue possible, we wish to Cuba, the Cuban people, the armed forces that you could make freedom for Cuba possible and to do everything you can to bring an end to Castro’s regime.” The MiG’s pilots did not respond to Basul-to’s encouragement to defect from Castro’s Government and did not fire any shots.
Basulto testified that on the next occasion of knowingly violating Cuban airspace, he flew over a small town where his father had been born near Guantanamo Naval Base and dropped BTTR bumper stickers. This incursion was on November 10, 1994. Once again, the Cuban Government did not respond with violence.
On July 13, 1995, BTTR escalated its efforts. To commemorate Cuba’s sinking of a tugboat full of people (ostensibly leaving Cuba) within Cuba’s territorial waters a year earlier, BTTR planned a demonstration in association with Democracia, a related anti-Castro group. Prior to July 13th, BTTR notified both U.S. and Cuban officials of its plan to commit “civil disobedience” within Cuban territorial waters. Cuba prepared itself, placing gun boats in the water and preparing MiGs. The United States State Department issued a public announcement, which Basulto saw, stat *1020 ing that pilots should not violate Cuban airspace.
Despite the warning, on July 13th, BTTR flew four planes into Cuban airspace and Democracia drove a boat (also named “Democracia”) into Cuban territorial waters. Basulto, the pilot in one of the planes, testified that as he approached Cuban airspace, Havana Air Traffic Control told him to leave. He ignored those warnings.
Basulto further testified that MiGs were in the air — passing and circling over him— and he saw gun boats in the water. Basul-to dropped a smoke canister out of his window at the point where the tugboat was believed to have been sunk. Then he flew over a Cuban gun boat, dropping leaflets.
He also flew the plane low over downtown Havana for approximately 13 minutes, dropping nearly 20,000 leaflets and religious medals. Basulto testified that he flew over Havana to divert attention away from the Democracia as those on board had notified Basulto via radio that a Cuban gun boat had rammed it.
Despite this run-in with the Cuban military, all participants returned safely to Miami. In an interview with the news media, Basulto told reporters that he “engaged in an act of civil disobedience and I did it to show the Cuban people they could do the same thing.”
Following the July 13, 1995 incident, a Cuban official sent a letter to the Federal Aviation Administration (“FAA”) notifying the FAA of the “violations of the Cuban aeronautical laws” committed by BTTR that day. The letter stated that the aircraft deviated from the routes described in their flight plans and ignored Cuba’s warnings. The letter also stated that these actions “may bring grave consequences” and asked that American officials “adopt whatever measures are necessary” to avoid “provocation” of Cuban sovereignty. The letter ended with a quotation from a public declaration Cuba released the day after the July 13th airspace violations: “Any craft proceeding from the exterior that invades by force our sovereign waters could be sunk and any aircraft downed.”
The United States Department of State then issued a statement warning pilots to avoid penetrating Cuban airspace. The statement quoted the Cuban declaration that any boat from abroad can be sunk and any airplane downed and stated that “[t]he Department takes this statement seriously.”
Despite the warnings from both Cuba and the United States, BTTR flew again in January of 1996. Over the course of two flights — on the 9th and 13th — BTTR escalated its efforts even further, dropping nearly 500,000 leaflets over Havana and nearby communities. The parties disputed at trial whether BTTR planes violated Cuban airspace on these flights, but viewing the facts in the light most favorable to the Government — as we must — none of the BTTR planes entered into Cuban airspace in January. According to Basulto, after taking into consideration wind speed and altitude, BTTR dropped these flyers in international airspace calculating that they would drop in or near Havana.
BTTR did not entirely ignore the warnings. In fact, Basulto and other BTTR members specifically contemplated that if they violated Cuban airspace the Cuban military might confront them and force them to land. Before the flight on January 9, 1996, BTTR made a videotape that it left behind in case the pilots did not return. Basulto stated, “If anything happens, being that we might be made to land in Cuba, we would like to clarify that, under pressure, any human being may say anything against his beli[efs].” Arnaldo Iglesias, another BTTR member, stated on *1021 the tape that he habitually blinked his eyes and that “[I]n case they were to make us land in Cuba, I’m going to make a great effort not to blink. Which means that what I’m saying, I don’t really feel.” Billy Sehuz, another BTTR member, then told the camera that he would do the opposite: that if captured and forced to land in Cuba, he would “blink continually.”
On January 15,1996 — -two days after the last leaflet dropping — Basulto appeared via telephone on “En Vivo,” a Cuban radio program. Basulto acknowledged responsibility on behalf of BTTR for the leaflet droppings. Portions of the conversation are relevant here:
[Host 1]: You were not attacked, the planes, nothing, right?
[Basulto]: That’s right. We were not .... uh, we have not received any type of, of attack from the Cuban government, up to now it has only been verbal.
[Host 1]: [W]hat was the objective sought, that you seek with this, with this action[?]
[Basulto]: Several objectives, one of them, the first is to give a message of solidarity. One of the messages in the flyers says uh, “Not comrades, brothers,” which is the same theme we’ve used before. Others say: “I am change,” implying that the main role for change in Cuba belongs to the Cuban people, who are the ones who have to act to change this regime.... All those pamphlets had, in the back, one or more of the chapters of the Universal Declaration of Human Rights, and in the back they also said: “Cuban, fight for your rights.” ... [W]e are urging our people, on the thirteenth of every month, they use, and I say thirteenth of every month because we use it as a reminder of the incident that happened on March thirteenth, the sinking of that boat, which was so tragic, and we use the thirteenth from now on so that on every month, all of us Cubans on the thirteenth do something, uh, some act of opposition, uh, of direct civic action against the government ... until we are able to gain enough strength to stop that government....
[Host 1]: Basulto, to what do you attribute the fact that the Cuban government did not have, did not have a military response against you, lack of organization, surprise[ ]?
[Basulto]: That is the same question that our compatriots on the island should asks [sic] themselves when they go to fear the government at a time they plan on doing something against it. We’ve been willing to take personal risks for this, they must be willing to do the same. Let them see that this regime is not invulnerable, that Castro can be penetrated, that many things can be done that are at our disposal. The thing is that we must, once and for all, do away with that internal police that we carry with us, that we think we’re always being watched. Well, we’re asking our people to meditate upon the possible things that can be done there, and for them to carry them out on the thirteenth day of each month.
Basulto’s testimony at trial was consistent with his “En Vivo” interview: he wanted his incursions into Cuban airspace to serve as an example to Cubans. He testified that he wanted to inspire Cubans to imitate his defiance of the Cuban Government and topple Castro’s regime.
Also on January 15, 1996, the Cuban Government again sent a letter to the FAA, informing the FAA that two of the *1022 same planes that crossed into Cuban airspace in July again crossed into Cuban airspace on January 13th. The letter quoted a public declaration that “Cuba has the necessary measures to guarantee integrity of [its] national territory” and that “violators [of Cuban airspace] should also be prepared to face the consequences.” The letter stated that such incursions into Cuban airspace could result in “serious consequences” for the crews and, again, Cuba appealed to the United States to adopt the necessary measures to prevent BTTR planes from violating Cuban airspace.
On February 24, 1996, three BTTR planes flew in international airspace close to Cuban territorial waters. As the planes approached Cuba, they were warned that they were “in danger” and that they were flying into an area that was “activated.” Basulto, however, ignored these warnings and his plane crossed into Cuban territory. The other two planes did not enter Cuban territory but were shot down 4.8 and 9.5 miles away from Cuban territorial airspace, respectively. When the shoot down occurred, Basulto’s plane was 2.1 miles into Cuban territorial airspace.
Basulto testified that at no time in his almost 2000 BTTR flights prior to February 24th did a MiG approach BTTR planes in international airspace. He also conceded at trial that he had been hearing the “warnings regarding the dangers of violating Cuban airspace for a long time” and that “we knew” a consequence of entering Cuban airspace could be a shoot down.
Within this context, we examine the evidence against Hernandez. The Government points to three intercepted communications between the Cuban Government and Hernandez to demonstrate the alleged conspiracy to commit murder. The first communication was sent on January 29, 1996, two weeks after the 500,000 leaflet dropping but before the shoot down. It is undisputed that prior to this date, there is no evidence linking Hernandez to a murder conspiracy. The January 29th message read:
Superior Headquarters approved Opera-ción Escorpión in order to perfect the confrontation of [counter-revolutionary] actions of BTTR. Info from [Roque] and [Gonzalez] should come with clear and precise specifications that allow to know without a doubt that Basulto is flying, whether or not activity of dropping of leaflets or violation of air space; if [Roque] or [Gonzalez] are or are not flying, anticipated plan any type BTTR flights, in order to know about these activities ahead of time. If there is not access this should also be a priority. Always specify if agents are flying....
The next day, the Cuban Directorate of Intelligence[1] added:
In addition report types of planes flying, registration, pilots and passengers, permission for flight, day and time, altitude, distance, what type of action will be taken. If [Roque] and [Gonzalez] are asked to fly at the last minute without being scheduled find excuse not to fly. If they cannot avoid it [Gonzalez] will transmit over the airplane radio the slogan for the July 13 martyrs viva Cua and [Roque] should call his neighbor Amelia and tell her that he will call her on Wednesday. If he cannot call he should say over the radio long live Brothers to the Rescue and Democra-cia. ...
*1023 The last relevant intercepted message (sent on February 18) read:
MX instructs that under no circumstances should [Roque] nor [Gonzalez] fly with BTTR or another organization on days 24, 25, 26, and 27, coinciding with celebration of Concilio Cubano in order to avoid any incident of provocation that they may carry out and our response to it. Immediately confirm when you instruct both of them....
Evidence showed that Hernandez met with both Roque and Gonzalez and relayed the messages received from the Directorate of Intelligence. These three messages are the extent of the evidence that the Government presented against Hernandez relating to his knowledge and conduct pri- or to the shoot down of the BTTR planes.
The Government also points to three other intercepted messages that occurred after the shoot down. A communication to Hernandez from Cuban officials stated, “We have dealt the Miami right a hard blow in which your role has been decisive.” One from Hernandez stated, “That the operation to which we contributed a grain of salt ended successfully.” Third, the head of the Directorate of Intelligence recognized Hernandez “[f]or outstanding results achieved on the job, during the provocations carried out by the government ... this past 24th of February.”

II. Discussion

Hernandez was convicted of conspiring with the Cuban Government to commit murder in violation of 18 U.S.C. § 1117, which, inter alia, makes it a crime to conspire to violate 18 U.S.C. § 1111. Section 1111 states “(a) Murder is the unlawful killing of a human being with malice aforethought.”[2]
To obtain a conviction for conspiracy, the Government must prove beyond a reasonable doubt: (1) an agreement by two or more persons to achieve an unlawful objective; (2) the defendant’s knowing and voluntary participation in the agreement; and (3) an overt act committed in furtherance of the conspiracy. See United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir.1998) (emphasis added). The evidence must establish a common agreement to violate the law. United States v. Parker, 839 F.2d 1473, 1478 (11th Cir.1988). The defendant need not know that the conduct is unlawful, but the conspirators must agree to commit unlawful conduct. United States v. Feola, 420 U.S. 671, 687, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Such an agreement may be proven with circumstantial evidence, but inferences are only permitted when “human experience indicates a probability that certain consequences can and do follow from basic circumstantial facts.” United States v. Villegas, 911 F.2d 623, 628 (11th Cir.1990). “[C]harges of conspiracy are not to be made out by piling inference upon inference.” Ingram v. United States, 360 U.S. 672, 680, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). “[T]he ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt.” Villegas, 911 F.2d at 628. Knowledge of the criminal act “must be clear, not equivocal.” See Ingram, 360 U.S. at 678-80, 79 S.Ct. 1314.
Furthermore, “parties must have agreed to commit an act that is itself illegal— parties cannot be found guilty of conspiring to commit an act that is not itself against the law.” United States v. Vaghela, 169 F.3d 729, 732 (11th Cir.1999). *1024 Also, the language in the substantive offense' — Section 1111 — states that “[m]ur-der is the unlawful killing ...” (emphasis added). And conspiracy to commit a particular offense “cannot exist without at least the degree of criminal intent necessary for the substantive offense itself.” Ingram, 360 U.S. at 680, 79 S.Ct. 1314.
A country cannot lawfully shoot down aircraft in international airspace, in contrast to a country shooting down foreign aircraft within its own territory when the pilots of those aircraft are repeatedly warned to respect territorial boundaries, have dropped objects over the territory, and when the objective of the flights is to destabilize the country’s political system. Thus, the question of whether the Government provided sufficient evidence to support Hernandez’s conviction turns on whether it presented sufficient evidence to prove that he entered into an agreement to shoot down the planes in international, as opposed to Cuban, airspace.
The majority opinion discusses the airspace issue, but it does so in the context of a different analytical framework: whether the mens rea requirement in subsection (a) of Section 1111 carries over to subsection (b). The opinion fails to address, however, whether the Government produced sufficient evidence to prove beyond a reasonable doubt that Hernandez agreed to commit an unlawful act. Such a discussion is necessary because our conspiracy law requires that those entering into a conspiracy have an agreement to commit an unlawful act and the substantive murder offense requires that the killing be unlawful. A shoot down in Cuban airspace would not have been unlawful; thus, Hernandez could not have been convicted of conspiracy to murder unless the Government proved beyond a reasonable doubt that he agreed for the shoot down to occur in international, as opposed to Cuban, airspace.[3]
Here, the Government failed to provide sufficient evidence that Hernandez entered into an agreement to shoot down the planes at all. None of the intercepted communications the Government provided at trial show an agreement to shoot down the planes. At best, the evidence shows an agreement to “confront” BTTR planes. *1025 But a “confrontation” does not necessarily mean a shoot down. BTTR’s videotape on January 9th clearly shows that BTTR members seriously contemplated that MiGs would “confront” them by forcing them to land. Richard Nuccio — an advisor to President Clinton on Cuban affairs— also thought BTTR’s repeated violations of Cuban airspace would result in a forced landing. He testified (and documents show) that conversations within the State Department suggested the same. Id. And Basulto testified that on the day of the shoot down he thought MiGs would fire warning shots. This evidence demonstrates the obvious: there are many ways a country could “confront” foreign aircraft. Forced landings, warning shots, and forced escorted journeys out of a country’s territorial airspace are among them- — as are shoot downs. But the Government presented no evidence that when Hernandez agreed to help “confront” BTTR that the agreed confrontation would be a shoot down.[4] To conclude that the evidence does show this goes beyond mere inferences to the realm of speculation.
Moreover, even assuming that Hernandez agreed to help Cuba shoot down the BTTR planes, the Government presented no evidence that Hernandez agreed to a shoot down in international airspace. It is not enough for the Government to show that a shoot down merely occurred in international airspace: the Government must prove beyond a reasonable doubt that Hernandez agreed to a shoot down in international airspace. Although such an agreement may be proven with circumstantial evidence, here, the Government failed to provide either direct or circumstantial evidence that Hernandez agreed to a shoot down in international airspace. Instead, the evidence points toward a confrontation in Cuban airspace, thus negating the requirement that he agreed to commit an unlawful act.
Basulto testified that in his nearly 2000 BTTR flights, MiGs never confronted him in international airspace. Further, every communication between Cuba and the FAA discussed the consequences for invading Cuba’s sovereign territory, including the letter Cuba sent on January 15th — only a month before the tragic events of February 24th. The evidence also shows that American officials at the White House and in the State Department never contemplated a confrontation in international airspace. And the intercepted communications between Cuba and Hernandez speak of a confrontation only if BTTR “provokes” Cuba. Further, the fact that the intercepted communications after the shoot down show that Hernandez was congratulated for his role and that he acknowledged participation and called it a “success” does not clearly establish an agreement to a shoot down in international airspace.[5] The Government cannot point *1026 to any evidence that indicates Hernandez agreed to a shoot down in international, as opposed to Cuban, airspace.
At most, the evidence demonstrates that Hernandez agreed to a confrontation in either Cuban or international airspace. But such an agreement is not enough to sustain a conspiracy conviction. See United States v. Fernandez, 892 F.2d 976, 986 (11th Cir.1990) (where discussion between alleged co-conspirators was susceptible to “either an illegal or legal interpretation,” evidence that the conversation occurred is insufficient to meet the Government’s burden to establish the unlawful-objective element of criminal conspiracy); United States v. Wieschenberg, 604 F.2d 326, 335—36 (5th Cir.1979)[6] (“mere association of two or more persons to accomplish legal and possibly illegal goals, accompanied by discussions to promote those goals, but with no discernible direction toward either the legal or the illegal objectives” cannot support a conspiracy conviction).
I would therefore affirm Hernandez’s convictions and sentences on Counts 1, 2, 4, 5, 6, 15, 16, 19, 22, 23, and 24, but I would reverse the conviction and sentence with regard to Count 3, conspiring to commit murder in violation of 18 U.S.C. § 1117.

. The intelligence gathering body within the Cuban government for whom the defendants worked.

. Subsection (b) of that statute states both the jurisdictional requirement and the punishment for violations of subsection (a).

. The majority opinion relies heavily on United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). In that case, Feola was convicted of assaulting federal officers and conspiring to assault federal officers. Id. at 674, 95 S.Ct. 1255. On appeal, Feola argued that while he and his co-conspirators agreed to an assault, they did not know that the victims of that assault were federal officers, and that, to sustain his conviction, the Government had to show that he knew those victims were federal officers. Id. at 674-77, 95 S.Ct. 1255. The Court disagreed. It concluded that the Government did not need to show that Feola knew that his victims were federal officers: the Government needed only to demonstrate that Feola had the intent to assault (for the substantive offense) and agreed to the assault (for the conspiracy offense). Id. at 684-85, 694-96, 95 S.Ct. 1255.
Thus, the Feola opinion states that the mens rea required in the non-jurisdictional elements of an offense do not apply to the jurisdictional element as well. I agree that Feola controls here for the limited purpose of the mens rea analysis: the Government did not need to prove that Hernandez knew the shoot down would occur in international airspace within this framework because the mens rea in§ 1111(a) is not imputed to § 1111(b). But where I disagree with the majority opinion is that I do not think the analysis stops there. The first element of conspiracy requires an agreement to commit an unlawful act, and the underlying murder statute requires that the killing be “unlawful.” Within these two analytical frameworks, which are separate and distinct from the mens rea framework, the Government must show that Hernandez agreed to an unlawful killing — that he agreed to a shoot down in international, as opposed to Cuban, airspace. As discussed below, because there is no evidence that Hernandez agreed to such a shoot down, I dissent.

. The majority states that the fact that the Directorate of Intelligence did not want agents flying with BTTR on certain days shows that Hernandez knew a shoot down was going to occur. This argument assumes that the Directorate of Intelligence believed "confrontations” other than shoot downs are safe for those on board. It is just as reasonable to conclude that the Directorate of Intelligence did not want its agents flying on those days because of the dangers inherent in any confrontation involving airplanes. (Indeed, Nuccio testified that he feared a forced landing would result in a crash.) Because so much evidence points toward a "confrontation” other than a shoot down, I cannot say that a reasonable jury — given all the evidence — could conclude beyond a reasonable doubt that Hernandez agreed to a shoot down.

. The majority focuses on Hernandez’s referring to the incident as a “success.” The fact that a spy refers to a shoot down of a perceived enemy plane as a "success” is not evidence that the spy agreed to help shoot *1026 down the plane in international, as opposed to Cuban, airspace.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.