**[DO NOT PUBLISH]**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 22, 2005
THOMAS K. KAHN
CLERK

_____

**No. 04-12706**

_____

D.C. Docket No. 03-00111-CR-T-17MAP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENRIQUE BALDERAS,
ISRAEL GOMEZ,

Defendants-Appellants.

_____

**Appeals from the United States District Court
for the Middle District of Florida**

_____

**(November 22, 2005)**

Before BIRCH, WILSON and COX, Circuit Judges.

**PER CURIAM:**

Enrique Balderas appeals his 97-month sentence for conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), and 846. Israel Gomez appeals his 127-month sentences for (1) aiding and abetting the possession of with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii), 18 U.S.C. § 2, and (2) conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), and 846. The appellants both argue that there was insufficient evidence to convict them, and Gomez further argues that the district court erred by denying a mistrial motion, giving improper jury instructions, and violating the Fifth and Sixth amendments under United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005), when it adjusted his sentencing range upward based on a drug quantity not charged in the indictment. Because we conclude that the district court lacked sufficient evidence to convict Balderas, we **REVERSE** and **REMAND** in part, and **AFFIRM** in part.

## I. BACKGROUND

At trial, Cheyvoryea Gibson, an agent with the Federal Bureau of Investigation ("FBI"), testified that on 1 October 2002 he was ordered to conduct surveillance on 904 Madison Street ("the residence"). He stated that, when he

2

drove by the residence, he noted that there was a minivan parked by the side, rear of the house, and Gomez appeared to have exited the residence and was walking toward the rear of the van. Gibson testified that, when he saw the van leave the residence, he followed it to an auto parts store. He stated that Gomez was driving the van and Balderas was sitting in the passenger seat. Gibson stated that he and Detective David Redus, a narcotics detective with the Hillsborough County Sheriff's Office, approached the defendants to question them. Upon questioning, Gomez did not indicate that he had just departed the residence and denied being in that area. Gibson stated that, after getting Gomez's consent to search his person, Gibson found a key and some paper items in his pockets. Gibson testified that one of the paper documents was a Yahtzee game score card with numerical figures and a total written on it. Another piece of paper had names, numbers, and a total written on it as well. Gibson stated that these papers were significant because they were consistent with papers kept by individuals who participate in narcotics transactions. He also testified that, when questioned about the key, Gomez stated that he did not have any idea where the key belonged, or to what lock it fit. Gibson stated that, during a search of the van, no marijuana was recovered. Gibson then stated that he and Redus drove Gomez and Balderas back to the residence, and, after obtaining a search warrant, they entered the residence, and

3

Gibson saw a long line of black plastic bags containing marijuana on the floor from the front door to the end of the residence. He testified that he also saw a large quantity of marijuana stacked in bales, packaging material, drug scales, and tools to cut up the marijuana in one of the bedrooms.

On cross-examination, Gibson testified that Balderas stated that Gomez picked him up on College Avenue, which was inconsistent with Gibson's observations during the surveillance. However, Gibson stated that he never saw Balderas at the house. He also testified that nothing on the tally sheet explicitly indicated that the sheet related to drugs. Gibson further stated that the van was not looked at by a crime scene unit and was not searched for drug residue, but when he and Redus made contact with the defendants, they "had the fresh smell of marijuana emitting from their persons." R4-106 at 107. Gibson stated that the van did not smell of marijuana.

Joseph West, a detective with the Hillsborough County Sheriff's Office, testified that he asked Gomez if he owned the key. West stated that Gomez told him that the key was not his and that he did not know how it got into his pocket. He further testified that, when he later conducted surveillance on the residence, he was informed by another detective that a white pickup truck had arrived at the residence and left a short while later. West stated that he and the other two

4

detectives with him followed the white truck and approached the driver, Alfredo Ponce, when he exited the vehicle. He testified that he did not observe Ponce exit the residence and did not observe any marijuana on his person.

William Sims, a narcotics detective with Hillsborough County Sheriff's Office, testified that, when he approached the residence, there was a strong aroma of marijuana coming from the house. He stated that, after he obtained a search warrant, he entered the residence using the key the other detectives had found in Gomez's pocket. Sims testified that they also found a bill inside the residence from TranSouth, in Gomez's name addressed to the residence. He further stated that inside the home they found (1) an overdue mobile phone bill notice, in Balderas's name, addressed to the residence, and (2) a Verizon telephone bill, in the name of Tanya Hunt, addressed to the residence. Sims also testified that approximately 1,522 pounds of marijuana were found at the residence.

Tanya Hunt, the ex-fiancé of Gomez's cousin, Ricardo Gomez, testified that Gomez and Balderas were best friends, and that Balderas was always with Gomez. She stated that she and Ricardo lived at the residence until Gomez told them to move out so the house could be repaired. Hunt stated that, one night, while she and Ricardo were staying at the Carroll Motel, Gomez's wife and sister visited Hunt and Ricardo and told them not to go back to the residence. The following

day she and Ricardo moved to Texas. She testified that the marijuana and the drug paraphernalia were not at the residence when they moved out. Hunt further testified that Gomez and Balderas received mail at the residence, and Gomez used to live in the house before she and Ricardo moved in.

Redus testified that a stash house is "a location where drugs are stored for a short period of time or a long period of time." R5-107 at 116. He also stated that "[l]edgers are used by drug traffickers to show how much drugs they are putting out on the street or how much money they're taking in from other drug dealers," and that the drug dealer has to know the amount of drugs given to other, lower-level dealers, so he knows how much money to get back from them. Id. Further, Redus testified that he was doing surveillance on the residence with Gibson, and, when he drove past the residence, he saw Gomez step from a set of stairs behind the residence onto the ground and walk toward the van parked next to the residence. After doing a U-turn on the street, Redus stated that he drove past the residence again and observed Balderas's entering the passenger side of the van and Gomez's getting into the driver's side of the van. He stated that when he finally made contact with Gomez and Balderas in the parking lot at the auto parts store, he noticed a strong odor of fresh marijuana on Balderas. Redus testified that Balderas told him that Gomez had picked him up on Highway 41 where he had

6

been hitchhiking and denied being at the residence. Further, Redus corroborated Gibson's testimony that a Yahtzee sheet had been recovered from Gomez's pocket, and the sheet appeared to be a tally sheet with drug weights on it. When asked why he thought those numbers were weights, Redus testified as follows:

> When I first looked at it knowing that we were dealing with a marijuana investigation, marijuana is usually annotated in pounds, and we know that this investigation involved a large quantity of marijuana based on the numbers that were next to the names. Those names being nicknames of known drug traffickers.

Id. at 125. Both defense counsel objected to the characterization as "known drug traffickers" and made a motion for a mistrial. Id. They argued that the comment was inappropriate from the witness at that time, had no probative value, and was "solely prejudicial, clearly inflamed the jury." Id. at 126.

The government responded that it had laid a foundation concerning Redus's breadth and extent of his experience, knowledge, training, and expertise, and Redus had only described why he thought that it was a drug tally sheet. The court overruled the objection and stated that once the names were elicited, the government could question him about who these individuals were and if they were specifically drug dealers. The court also instructed both defense counsels that if the government did not proceed in a proper manner, they were free to object and hold another sidebar.

7

Following the objections, Redus testified that when he first looked at the names they appeared to be nicknames or first names of people that law enforcement had previously identified as being in the business of selling marijuana. Naming each person individually, Redus then indicated that four of the six names were specifically known to law enforcement as individuals who sold marijuana. He stated that, although there were no last names listed on the sheet, drug tally sheets often did not list both first and last names and rarely had "100 pounds of marijuana" written out on the sheet next to the names. Id. at 129. Redus testified that the total of the numbers on the tally sheet was 461, and that number was consistent with pounds of marijuana. He also stated that, further down on the sheet, the 461 had been subtracted from 1,911 to reach another figure. He stated that this was consistent with a drug tally sheet, because it would have shown how much marijuana was distributed compared to what they initially received, and how much they should have left.

Redus testified that marijuana is shipped from the Texas/Mexico border in a big block form, and once it reaches its final destination, the block is unwrapped, weighed, and broken down into smaller bags of various sizes, depending on the needs of the customer. He stated that the transportation, breaking down, and distribution of the marijuana involved "a whole organization of multiple people."

8

Id. at 136. Redus testified that the organization can include (1) people at the border to load the tractor-trailers, (2) the owner of the marijuana who sees that the truck gets on its way and then flies to the final destination and meets the tractor trailer to ensure that all of the marijuana arrived, (3) another person or persons to take the tractor trailer to another location to offload it, and (4) people to transport the marijuana to a stash house for further distribution to other customers. He further stated that the person who is carrying the tally sheet was responsible for ensuring that the marijuana was broken down correctly, that each customer received the correct amount, and the correct amount of money was returned to him.

On cross-examination, Redus testified that he could not state that the odor of marijuana coming from Balderas was from the same marijuana that was found in the residence, but he could tell that the smell did not come from the personal use of marijuana. He also stated that, when the van was searched at the auto parts store, he did not find any significant amount of money or marijuana residue, however, the van did have an odor of marijuana. He also stated that the 461 pounds that were listed on the Yahtzee sheet[1] were the pounds of marijuana that were already distributed and never found by law enforcement.

---

[1]The Yahtzee sheet also contained notations for video game cheat codes.

On redirect examination, Redus was asked why people in a drug trafficking organization are reluctant to come forward to testify against their peers. He responded: "In fear of reprisal. We know that the Mexican drug trafficking organizations are very violent organizations, and the reprisal a lot of time is murder." Id. at 185. Both defense counsels objected and moved for a mistrial. They argued that Redus portrayed Mexican Americans as "being violent and being killers" which was prejudicial and irrelevant as to whether the defendants possessed marijuana. Id. at 186. They further contended that the government had not alleged that the defendants were members of a broader organization, and that Redus's statement implied that no one would testify against Gomez and Balderas for fear that Gomez and Balderas would kill them.

The government responded that its intent was not to create the inference that Gomez and Balderas were killers, but rather to clarify why the people on the Yahtzee sheet had not been arrested or come forward. The government argued that it was entitled to show why the listed drug traffickers had not been arrested because Gomez's and Balderas's theory of the case seemed to be that the investigation work was insufficient. It further asserted that the nationality of the people listed was irrelevant, and that defense counsel, not the government, brought up the nationality of the names. The government also stated that it had evidence

of murders in Texas that were related to this case but did not want to get into the crimes of violence. It averred that it thought that the detective would have said that the people had not come forward out of fear, but the detective went further than the government had anticipated.

The court then denied the mistrial motions and instructed the government to pose two questions to the detective to clarify that the detective had no knowledge of any involvement by Gomez and Balderas in crimes of violence and that they had never been involved in any threats of crimes of violence or violence toward witnesses. Redus testified that he had no knowledge that either of the defendants had committed a crime of violence and had no knowledge that either of the defendants threatened anyone with violent acts.

Following the government's presentation of its case, Balderas rested. Gomez then called, among other witnesses, Alfredo Ponce to testify on his behalf. Ponce testified that, on 1 October 2002, he went to the residence to look for a job at the tomato company where Gomez and Ricardo worked. He stated that he went to knock on the door, and when he sensed a smell "like a dead animal," he rushed back to his truck and drove away. Id. at 279-81. On cross-examination, when the government asked Ponce if it was true that when he first met with Detective Sims, he told him that he "smelled weed real bad" at the residence, Ponce stated it was

11

not true.  Id. at 297.  When asked if it was true that he was uncomfortable saying in his affidavit that he smelled marijuana, and instead wrote that there was a "strange smell," Ponce stated that it was not true.  Id. at 298.  The government then asked, "Isn't it true that you said you didn't want to put it smelled like marijuana on that paper because you said that you were afraid of the guys there at [the residence]."  R6-108 at 18.  Ponce replied that he never said that and also denied saying that to Detective Sims.  Id. at 18-19.

In a sidebar conference during redirect by Gomez, the defense attorneys renewed their earlier motions for a mistrial.  They stated that, after the denial of their earlier motion for a mistrial regarding Redus's statement that "Mexican gangs were violence related," and Redus's curative statement that the defendants had not threatened anyone, the government's question to Ponce insinuated that Ponce was scared of the defendants.  Id.  Further, the defense attorneys stated that they thought that the government would call Detective Sims as a rebuttal witness to say that, "at the time he said he was scared of the guys in that house with the implication being our clients."  Id. at 28. According to the defense, they had "undone everything" that was done to resolve the earlier mistrial motion.  Id.

The government responded that it did not call Ponce to the stand, and it had Sims's report wherein Sims stated that Ponce told him that the residence smelled

12

strongly of marijuana but he did not want to put that fact into his affidavit because "he was afraid of the – of these guys over here." Id. at 28-29. The government maintained that Gomez called Ponce to the stand and presented evidence that Ponce did not smell marijuana at the location but that he smelled a dead animal or body. The court denied both motions for a mistrial.

On Ponce's recross-examination, Balderas's attorney asked Ponce if he had any fear of sitting in the courtroom with Balderas, and Ponce replied that he did not. Balderas's attorney asked him if, on 1 October 2002, he was ever in fear of Balderas, and Ponce replied that he was not. Finally, Balderas's attorney asked Ponce if, since 1 October 2002, anything had happened that led him to believe he had a reason to fear "any type of reprisals" from Balderas, and Ponce replied that there did not. Id.

After Gomez rested, the government recalled Sims as a rebuttal witness. On cross-examination, Balderas's attorney asked him whether it would be unusual for a person who was not involved in crime to be scared of someone he thought was involved in crime. Sims replied that it would not be unusual.

At the close of the government's case, Balderas and Gomez made an oral motion for a judgment of acquittal. The court denied both motions.

13

Before closing arguments, the court held a conference with all of the parties to discuss the jury instructions and the special verdict form. The government proposed a special jury verdict form for each defendant that asked the jury, after they found the defendant guilty of count one, to determine if "the defendant's offense charged in Count One involve[d] one hundred (100) kilograms or more of a mixture or substance containing a detectable amount of marijuana," and after finding the defendant guilty of count two, to determine if "the defendant's offense charged in Count Two involve[d] one hundred (100) kilograms or more of a mixture or substance containing a detectable amount of marijuana?" R1-48. Gomez submitted a special verdict form, which gave the jury the opportunity, for count one, to find him guilty or not guilty as to 100 kilograms or more of marijuana, more than 50 kilograms but less than 100 kilograms of marijuana, and less than 50 kilograms of marijuana. The same three options were available to the jury for count two.

The government argued that to include an option on the verdict form for more than 50 kilograms but less than 100 kilograms of marijuana was irrelevant because the statute broke the sentence down to 10 years to life imprisonment for 1,000 kilograms, 5 to 40 years for 100 kilograms or more, 0 to 20 years for a detectable amount. The 50 kilogram lesser included option would have no effect

14

on the penalty provisions.  The government asserted that its special verdict form allowed the jury to determine if the defendant was guilty of the offense, and then determine if the offense involved more than 100 kilograms.  Thus, if the jury found him guilty but did not find that the offense involved more than 100 kilograms, they would have found the defendant guilty of the offense involving more than 0 but less than 100 kilograms of marijuana.  The government contended that to have anything more would be confusing to the jury and unnecessary.

Gomez and Balderas both agreed that the 50 kilogram instruction was unnecessary.  The defendants argued, however, that, for the purposes of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), it was necessary to give the jury the option to select more than 0 but less than 100 kilograms of marijuana because there was a factual basis for less than 100 kilograms.  The court determined that the government's special verdict form would stand, the defendants' objections were overruled, and their motions, if any, were denied.

During its closing argument, the government stated as follows:

Israel Gomez also lies about not coming from 904 Madison.  When the police approach them, pull Ricky away, of course he's smelling of marijuana, pulls Ricky away. Does he say, you know what, you know what, Detective, you're not going to believe this, I was down here at this house and it really smelled of marijuana.  Go by – we were going to go collect some rent, go by, go up to the house, there's something you may want to know.  Did Israel Gomez say anything – anything remotely like that?  No.

15

R6-108 at 89-90. The defense attorneys objected to the government's statement as to what the defendants did not say or what they could have said because it was a direct comment on their silence, and, thus, they requested a mistrial. The government responded that it was not a comment on their silence, but was a comment about their statements to law enforcement at the time they were questioned. The court denied the motions for a mistrial.

The jury subsequently found Balderas not guilty on count 1 and guilty on count 2. Furthermore, the jury found the offense in count 2 involved 100 kilograms or more of marijuana. The district court sentenced Balderas to 97 months of imprisonment.

The jury found Gomez guilty on both counts, and determined that the offenses in counts 1 and 2 involved 100 kilograms or more of marijuana. Following his conviction, the probation department created a pre-sentence investigation report ("PSI"), wherein it attributed to Gomez a base offense level of 30 because he was responsible for 1,983 pounds of marijuana, which converted to 899.49 kilograms. Pursuant to U.S.S.G. § 2D1.1(c)(5), the base offense level for at least 700 kilograms but less than 1,000 kilograms of marijuana is 30. A base offense level of 30 and a criminal history category of II resulted in a guideline range of 108 to 135 months. However, the PSI indicated that the government had

filed a motion for an enhanced penalty, pursuant to 21 U.S.C. § 851(c), because Gomez had previously been convicted, in state court, of several drug crimes, including drug trafficking. Based on this prior conviction, Gomez's statutory minimum imprisonment term was 120 months, making his Guideline range 120 to 135 months of imprisonment, pursuant to U.S.S.G. § 5G1.1(c)(2). Gomez objected to the PSI, and argued that he should be held responsible for a drug quantity between 400 and 700 kilograms, which placed him at an offense level of 28.

The government also objected and stated that the actual amount of marijuana that was part of the drug shipment was approximately 2,000 pounds, which was a base offense level of 30 (i.e. between 700 and 1,000 kilograms). This amount was calculated from the drug ledger seized from Gomez which reflected 461 pounds of marijuana, and a confidential informant ("CI") provided information that Juan Trevino had directed Gomez and Balderas to move the marijuana that was stored at the residence, and told the CI that 2,000 pounds of marijuana had come in.

At sentencing, Gomez argued that the amount of marijuana found in the residence was 1,522 pounds. He also maintained that the ledgers containing the alleged marijuana amounts did not add up to any one number because the 461 was

17

subtracted from two different figures. Further, Gomez asserted that the numbers that allegedly represented drug amounts had gaming codes for a computer game on the other side, so it was unclear what those numbers really represented.

The government averred that there may have been two drug loads, which would account for the difference between the 1,961 pounds on the ledger and the 1,522 that was seized, which would then total up to around 4,000 pounds for which Gomez would be accountable. The government maintained that the Nintendo codes on the back of the sheet did not refute the fact that the 461 amount was a drug amount total. Gomez replied that it was unclear from which number, 1,961 or 1,522, the 461 should be subtracted from.

The district court overruled the objection and concluded that the government established that there were at least 2,000 pounds of marijuana, and, because the jury found both defendants guilty, it must rely on the jury's evaluation of the facts. The court then noted that Gomez's lack of education and ability to do a job caused him to turn to a life of crime. It noted that the statutory minimum was 120 months and the government had requested the Guidelines maximum of 135 months; however, the court stated that, because Gomez had "been a bad person," it was sentencing him in the middle, at 127 months of imprisonment for each count to run concurrently. R7-101at 46.

18

## II. DISCUSSION

On appeal, Gomez argues that (1) the district court erred in denying his mistrial motions relating to (a) the government's improper characterization of him as a drug trafficker, (b) implications that he was violent, and (c) the government's improperly commenting on his silence during its closing arguments, (2) the district court erred in failing to give the jury the lesser included instruction on the special verdict form that he had possessed less than 100 kilograms of marijuana, and (3) his Fifth and Sixth Amendment rights were violated when his base offense level was adjusted upward eight levels based on a quantity of drugs not charged in the indictment, in violation of United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005). Balderas argues that the district court erred in concluding that there was sufficient evidence presented at trial to sustain his conspiracy conviction and denying his motion for an acquittal. In their briefs, each defendant expressly adopted the arguments of his co-defendant.

A.    Sufficiency of the Evidence

On appeal, the defendants argue that the case against them regarding the conspiracy to possess with intent to distribute more then 100 kilograms of marijuana was circumstantial, and that no direct or circumstantial evidence existed of any illegal agreement between them. They maintain that (1) the detectives

19

never saw them inside or leaving the residence, (2) when the detectives stopped them at the auto parts store, the detectives did not find any marijuana residue in the van or on their persons even though both of the defendants and the van smelled like fresh marijuana, and (3) neither of them lived in the residence during the nine months prior to the discovery of the marijuana and their arrest because Gomez's cousin and his wife lived there.

We review de novo the denial of a defendant's motion for acquittal. United States v. Ryan, 289 F.3d 1339, 1346 (11th Cir. 2002) (per curiam). In considering whether the evidence against the defendant was sufficient, we draw all reasonable inferences in the government's favor. Id. The question is whether "'a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" Id. (citation omitted).

We do not give any deference to the district court's decision on sufficiency of the evidence. United States v. Taylor, 972 F.2d 1247, 1250 (11th Cir. 1992). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Young, 906 F.2d 615, 618 (11th Cir. 1990). Further, we have stated that we will not review a defendant's sufficiency

claim when he does not submit independent briefing on the issue and merely adopts the arguments of his co-defendant.  See United States v. Khoury, 901 F.2d 948, 963 n.13 (11th Cir. 1990), modified, 910 F.2d 713 (11th Cir. 1990).

In order for the defendant to be convicted of conspiracy, the government must establish that (1) a conspiracy existed, (2) the defendant knew of the conspiracy, and (3) the defendant, with knowledge, voluntarily joined the conspiracy.  United States v. Toler, 144 F.3d 1423, 1425-26 (11th Cir. 1998).  A conspiracy is defined as an "'agreement to commit an unlawful act.'"  Id. at 1425 (citation omitted).

In his brief, Gomez does not argue that the evidence was insufficient to sustain his conviction; however, he indicates that he "adopts the issues, statements of facts and arguments set forth in Appellant Enrique Balderas' brief."  Appellant Gomez's Br. at viii.  Because Gomez did not submit independent briefing on his sufficiency argument, we do not review his claim.  See Khoury, 901 F.2d at 963 n.13.

However, we find that the district court erred in concluding that there was sufficient evidence to support Balderas's conviction.  In United States v. Villegas, we reversed the conviction of an alleged conspiracy defendant due to insufficient evidence.  911 F.2d 623, 628 (11th Cir. 1990).  In that case, the defendant's

21

brother was involved in a conspiracy to distribute cocaine. Id. at 627. The only evidence against the defendant was that he was outside the house while his brother made a cocaine transaction, and he followed his brother to a mall where he went inside the mall while further transactions took place. Id. at 628. The police described the defendant's activities as counter-surveillance, id.; however, we held that his mere presence at the transactions and association with his brother was insufficient to establish the requirements for his knowing participation in the conspiracy. Id. at 629.

Conversely, in United States v. Gamboa, we held that there was sufficient evidence to support the defendant's conspiracy conviction because the defendant rode in the truck with his co-defendants to the scene of the drug transaction, he was riding in the truck with the drugs, and he spent most of the day at a residence where drug paraphernalia was found. 166 F.3d 1327, 1332 (11th Cir. 1999). We also cited the fact that, before all of the defendants drove to the scene of the drug transaction, the defendant walked to the truck and leaned toward the truck's console, where the drugs were later found, which suggested that he actively participated in the concealment of the drugs. Id. In United States v. Lyons, we found that there was sufficient evidence to support the defendant's conspiracy conviction because he was with his co-defendant when his co-defendant met with

22

the undercover agent to discuss a drug buy, he went with his co-defendant to the crack house to secure crack for the transaction, and he returned with his co-defendant to give the crack to the undercover agent. 53 F.3d 1198, 1202 (11th Cir. 1995). Further, in United States v. Catchings, we also held that there was sufficient evidence to support the defendant's conspiracy conviction even though he only participated on one day and entered the conspiracy after its inception. 922 F.2d 777, 781 (11th Cir. 1991) (per curiam). We stated that he "knew and aided [the conspiracy's] essential purpose." Id.

However, unlike in Gamboa, Lyons, and Catchings, Balderas was seen only in Gomez's van, there was no testimony that Balderas was in the residence or, if he was inside, how long he had been there. Gomez and Balderas were going to an auto parts store, the van did not have any marijuana residue in it, and the detectives did not find any money in the van. Further, there was no evidence at trial that Gomez and Balderas were going to a drug transaction, and there was nothing that suggested that Balderas actively participated in the conspiracy or that he aided the drug conspiracy's essential purpose. See Lyons, 53 F.3d at 1202; Catchings, 922 F.2d at 781. Although Balderas smelled like fresh marijuana, and Tanya Hunt testified that Balderas was best friends with Gomez and was at the residence before, there is nothing in the record to indicate that Balderas did

23

anything other than be present at the residence with his close friend, Gomez. Mere presence at the scene of a crime, although a factor for a conspiracy conviction, is not by itself sufficient to support a conspiracy conviction. See United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001); Villegas, 911 F.2d at 629. Likewise, mere association with conspirators is not sufficient to support the conviction. See Villegas, 911 F.2d at 629.

Further, in United States v. Morales, we held that there was sufficient evidence to support the defendant's conspiracy conviction because the apartment's lease where the drug transactions took place listed the defendant and his co-defendant as residents, the defendant had signed the lease for the apartment, and two rental receipts, dated six days before the drug transaction, had his name on them. 868 F.2d 1562, 1573 (11th Cir. 1989). We stated that this evidence proved that the defendant had dominion and control over the apartment, and, because that was where the drug transaction took place, there was sufficient evidence to establish his role in the conspiracy. Id. However, in the present case, although a bill in Balderas's name was found at the residence, there is nothing to suggest that he lived at the residence during the time that the marijuana was stored there. In fact, both Hunt and Gomez's wife testified that Balderas did not live there in the nine months preceding the discovery of the marijuana. Moreover, there is nothing

24

in the record to suggest that Balderas had dominion or control over either the residence or the contents therein. Hunt testified that the things found inside the home were her and Ricardo's things that they had left when they moved out so the house could be fixed.

Therefore, there was nothing in the record to indicate that Balderas voluntarily and knowingly joined in the conspiracy, and the district court erred in denying his motion for judgment of acquittal. See Toler, 144 F.3d at 1425-26. While Balderas's actions and the limited evidence presented may cause reason for suspicion, they are insufficient to prove beyond a reasonable doubt that he was actively participating in the conspiracy. Accordingly, we reverse the decision of the district court on this issue and remand for entry of a judgment of acquittal. Because we are ordering the district court to enter a judgment of acquittal, Balderas's remaining arguments that he adopted from Gomez's brief are irrelevant. Thus, the remainder of this opinion analyzes Gomez's claims as they relate to him only.

B.     Mistrial Motions

On appeal, Gomez asserts that the district court erred in denying his mistrial motions and thereby violating his due process rights. Specifically, he contends that (1) when Redus testified that the Yahtzee sheet found in Gomez's pocket was

a drug tally sheet, and the individuals listed on that sheet were known drug traffickers, he improperly implied that Gomez was a drug trafficker; (2) when Redus testified that people do not typically come forward in drug cases to testify because drug trafficking organizations are violent and that people feared being killed, he improperly implied that Gomez was a violent person; (3) when, on cross-examination, the government asked Ponce if it was true that he indicated in his affidavit that he smelled "a strange smell" rather than the smell of marijuana coming from the residence because he was afraid of the guys at the residence, it improperly implied that Ponce was afraid of Gomez and Gomez was a violent person, and (4) when the government stated during closing that Gomez never told the officer that the residence smelled like marijuana, that he was at the residence and saw the marijuana, or otherwise indicate that the detective should investigate the residence for drug activity, it improperly commented on his silence.

We review for abuse of discretion a district court's denial of a motion for a mistrial. United States v. Ettinger, 344 F.3d 1149, 1161 (11th Cir. 2003). A defendant is entitled to a grant of a mistrial only upon showing that he was substantially prejudiced. Id.

In order for a defendant to prevail on a claim of prosecutorial misconduct, he must establish (1) that the prosecutor's comments were improper, and (2) that

26

those comments prejudicially affected his substantial rights.  See United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998).  In order to  meet the substantial prejudice prong, the improper comments must have "so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process."  Parker v. Head, 244 F.3d 831, 838 (11th Cir. 2001) (quotation omitted).  To assess the prosecutor's statements' impact, we must evaluate them in the context of the entire trial and assess their probable impact on the jury.  See Hernandez, 145 F.3d at 1438.

The Federal Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  FED. R. EVID. 401.  All relevant evidence is admissible, and irrelevant evidence is inadmissible.  FED. R. EVID. 402.  However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  FED. R. EVID. 403.

Indirect references to a defendant's silence do not constitute reversible error per se, and we must consider the references' impact on the jury.  United States v. Exarhos, 135 F.3d 723, 728 (11th Cir. 1998).  A comment is not an impermissible reference "unless (1) it was the government's manifest intention to do so, or (2) it

27

was of such a character that a jury would naturally and necessarily take it to be a comment on the defendant's silence." Id. (quotations omitted). "When the use of a defendant's silence results in a constitutional violation, the conviction can stand only if the reviewing court is satisfied beyond a reasonable doubt that the error was harmless." United States v. Tenorio, 69 F.3d 1103, 1106 (11th Cir. 1995).

In addressing cumulative error claims, we must examine the trial as a whole to determine if the defendant was afforded a fundamentally fair trial. United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997). However, we have also stated that if there are no errors on the individual arguments, there can be no cumulative error. United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (per curiam), cert. denied, __ U.S. __, 125 S. Ct. 208 (2004).

The district court did not abuse its discretion when it denied Gomez's motions for a mistrial. Redus's testimony that (1) a Yatzee sheet that was found in Gomez's pocket appeared to be a drug tally sheet, and (2) the names on the tally sheet were those of known drug traffickers, was not improper. Redus explained that he knew that four of the six names were people known to distribute marijuana, and this information was relevant to establish why he believed that the Yatzee sheet was actually a drug tally sheet. See Hernandez, 145 F.3d at 1438; FED. R. EVID. 401, 402.

28

Furthermore, the district court did not abuse its discretion when it denied Gomez's mistrial motion based on Redus's testimony that indicated that people do not generally come forward in these types of drug cases to testify because drug trafficking organizations are violent and people feared being killed. The government attempted to explain to the jury that the people on the list may not have come forward to testify against the defendants out of fear, a question that many jurors may have had regarding the people on the drug tally sheet. Further, any problem that may have arisen because of the testimony was cured when Redus specifically testified that he had no knowledge that either of the defendants had committed a crime of violence or had threatened anyone with violent acts.

Moreover, later in the trial, the government attempted to impeach Ponce by asking him if it was true that he stated he smelled a "strange smell" at the residence in his affidavit, and did not write that he smelled marijuana, because he told the detectives that he was afraid of the guys at the residence. This question did not form the basis for a mistrial because the defendants had set forth that Ponce had written that he smelled a strange smell because he, in fact, had smelled a strange smell, and not marijuana. However, the detective who interviewed Ponce had indicated in his report that Ponce told him that he did not want to put marijuana down because he was afraid of the people at the residence, and, under

29

the Federal Rules of Evidence, the government was entitled to impeach Ponce with this information. See FED. R. EVID. 607 ("The credibility of a witness may be attacked by any party. . . ."). Later, Ponce testified that he did not fear Balderas before, during, or after the events on 1 October 2002, the day Gomez and Balderas were arrested. Therefore, the testimony was proper and relevant to the trial, and the defendants' substantial rights were not violated because any potential problem was cured when Ponce testified that he never feared Balderas. See Hernandez, 145 F.3d at 1438; FED. R. EVID. 401, 402.

Additionally, the district court did not abuse its discretion when it denied Gomez's mistrial motion during the government's closing arguments. During its closing arguments, the government commented that, when Gomez was talking to the detective at the auto parts store, he never told them or otherwise indicated that the residence smelled like marijuana, that he was at the residence and saw marijuana, or that the police should go investigate the residence for drug activity. However, Gomez concedes in his brief that the comment referred to a time after Gomez was arrested but before he was given his Miranda rights. Under United States v. Rivera, such comments are appropriate when the defendant's silence occurred after arrest but before Miranda warnings are given. 944 F.2d 1563, 1568 (11th Cir. 1991).

Finally, Gomez contends that, even if the district court did not err in denying each of his motions individually, the cumulative effect of the allegedly prejudicial evidence warrants a reversal of his conviction. However, because, as noted above, Gomez cannot demonstrate that the district court erred in denying any of his motions, there can be no cumulative error. See Waldon, 363 F.3d at 1110. Therefore, the district court did not abuse its discretion in denying the mistrial motions.

C.    Special Verdict Form

Gomez next contends that he was entitled to a lesser included jury instruction which would have allowed the jury to find him guilty, on the special verdict form, of less than 100 kilograms of marijuana. He argues that the special verdict forms should have included an option for the jury to chose whether he had possessed, and conspired to possess, more than 0 but less than 100 kilograms of marijuana. We review for abuse of discretion a district court's refusal to give a jury instruction and its denial of a request for a special verdict. United States v. Cornillie, 92 F.3d 1108, 1109 (11th Cir. 1996) (per curiam) (jury instruction); United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996) (special verdict). Such abuse would occur if the evidence would permit a jury to find the defendant guilty of the lesser, but not the greater, offense. Cornillie, 92 F.3d at 1109.

31

We have stated that 21 U.S.C. § 841(b) provides the penalties for 21 U.S.C. § 841(a) and becomes applicable only after a defendant is convicted of a substantive § 841(a) violation. See United States v. Sanchez, 269 F.3d 1250, 1264-1265 (11th Cir. 2001) (en banc). Further, we have stated that "[t]he nature and quantity of the controlled substance are relevant only to sentencing and do not constitute elements of a lesser included offense." United States v. Williams, 876 F.2d 1521, 1525 (11th Cir. 1989).

Gomez was convicted for aiding and abetting the possession of with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii), 18 U.S.C. § 2, and conspiracy to possess, with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii), and 846. In order for the jury to convict, it did not have to determine the specific amount of marijuana that he conspired to possess. Although Gomez was charged and convicted of § 841(b)(1)(B)(vii), that subsection deals only with the penalties for § 841(a) offenses. It is not needed for purposes of the substantive conviction under § 841(a). See Sanchez, 269 F.3d 1250, 1264-1265. Furthermore, the jury's determination of whether Gomez's offenses involved 100 kilograms or more of marijuana is needed only to determine his penalty (sentence) and does not constitute elements of a lesser included offense. See Williams, 876 F.2d at 1525.

Moreover, the manner in which the special verdict form was constructed allowed the jury to find that Gomez was guilty of the offenses, but that the offenses included less than 100 kilograms of marijuana. On both counts, if the jury concluded that he was guilty, then it had to determine if the offense involved more than 100 kilograms by placing a mark next to "yes" or "no." If the jury found that Gomez was guilty, but selected "no," thus concluding that the offense did not include more than 100 kilograms of marijuana, the jury's verdict would be that he was guilty of the offense and the offense included more than 0 but less than 100 kilograms of marijuana. Therefore, the district court did not abuse its discretion in denying Gomez's request to include the lesser included offense of more than 0 but less than 100 kilograms of marijuana on the special verdict form.

D. *Booker* Violations

Finally, Gomez avers that he was held responsible for 2,000 pounds of marijuana, which was 4 offense levels higher than the amount of marijuana charged in the indictment, thus violating his Fifth and Sixth Amendment rights under Booker, 543 U.S. at ___, 125 S. Ct. at 749. He argues that, at sentencing, the judge determined that the number 461 on the Yatzee sheet was pounds of marijuana in addition to the 1,522 pounds of marijuana found at the house, bringing the total amount of marijuana he was responsible for to 2,000 pounds,

which was not a fact that he admitted or that was found by a jury beyond a reasonable doubt.

Gomez raises this issue for the first time on appeal. We review for plain error those issues in which timely objections were not made in the district court. United States v. Olano, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776 (1993); see also FED. R. CRIM. P. 52(b). To prevail under a plain-error standard, the appellant must prove the following three requirements: (1) there must be an error; (2) that error must be plain; and (3) the plain error must affect substantial rights. Olano, 507 U.S. at 732, 113 S. Ct. at 1776. Once the appellant proves these three elements, we may notice the error only if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 736, 113 S. Ct. at 1776 (quotation omitted).

We have recently concluded that, in Booker, the Supreme Court held that "the Sixth Amendment right to trial by jury is violated where *under a mandatory guidelines system* a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005)

(emphasis in original) reh'g denied, ___ F.3d ___, ___ (11th Cir. 2005) (en banc).[2]

A second error can also exist, under Booker, when the district court applies the Guidelines without considering them advisory. United States v. Shelton, 400 F.3d 1325, 1330-31 (11th Cir. 2005). If such error occurs, it is plain. Rodriguez, 398 F.3d at 1299; Shelton, 400 F.3d at 1331.

Even if the district court plainly erred when it (1) determined that the 461 number on the Yatzee sheet was a drug amount, and used it to increase the amount of drugs Gomez was responsible for (from 1,522 pounds to 1,983 pounds), which was a fact that was neither admitted by Gomez nor found by the jury, and (2) sentenced Gomez under a mandatory Guidelines system, Gomez cannot demonstrate that the error affected his substantial rights, as required by the third prong of the plain error analysis. For a Sixth Amendment violation, the defendant has the burden of demonstrating that the error "affected the outcome of the district court proceedings." Rodriguez, 298 F.3d at 1299 (quotation omitted). For a mandatory guidelines Booker error, the defendant has the burden of demonstrating that there was a "reasonable probability of a different result if the guidelines had

_____

[2] A petition for writ of certiorari was filed in Rodriguez. Rodriguez v. United States, No. 04-1148 (U.S. Feb. 23, 2005). On 20 May 2005, the Solicitor General of the United States responded that review is warranted to resolve a circuit split regarding the proper application of the plain-error standard to forfeited sentencing errors under Booker.

been applied in an advisory instead of binding fashion by the sentencing judge in this case." Shelton, 400 F.3d at 1332 (quotation omitted). A reasonable probability means a probability "sufficient to undermine confidence in the outcome." Id. (quotation omitted).

During the sentencing hearing, the district court never indicated that, but for the Guidelines, it would have given Gomez a different sentence. On the contrary, the court noted that Gomez's lack of education and ability to do a job caused him to turn to a life of crime. It also noted that the statutory minimum was 120 months and the government requested the Guidelines maximum of 135 months. However, the court stated that, because Gomez had "been a bad person," it was sentencing him in the middle, at 127 months, only 7 months above the statutory minimum. Nothing in the record indicates that, if it had to re-sentence Gomez, the district court would have imposed a different sentence. Accordingly, Gomez cannot establish that his substantial rights were violated by the district court's error. See Rodriguez, 298 F.3d at 1299; Shelton, 400 F.3d at 1332.

### III. CONCLUSION

Upon review of the record and the parties' briefs, we discern no reversible error as to Gomez and affirm his conviction and sentence. As to Balderas, however, we vacate his conviction for conspiracy to distribute 100 kilograms or

more of marijuana due to insufficient evidence, and remand for entry of a judgment of acquittal. As we have explained, we **AFFIRM** in part and **REVERSE** and **REMAND** in part**.**