[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 31, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12731
Non-Argument Calendar

_____

D. C. Docket No. 05-60189-CR-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AUDY FACEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 31, 2007)**

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Following a jury trial, Audy Facey was convicted of conspiracy to possess

with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and was sentenced to 75 months in prison. He appeals, challenging the sufficiency of the evidence supporting his conviction. He also argues that the district court erred in providing the jury with corroborative transcripts of his recorded conversations, without proper safeguards, and that this error caused him prejudice. Upon review, we AFFIRM.

## I. BACKGROUND

Facey's conviction arises out of a conspiracy to import approximately 600 pounds of marijuana from Jamaica to the United States. In January 2004 the DEA was informed by Rohan ("Ron") Gordan, a paid confidential informant operating in Jamaica, that two Jamaican smugglers, Patrick Thompson and Denton Hall, were attempting to smuggle a large amount of marijuana into the United States by boat. The DEA instructed Gordon to move forward with the operation, and to act as the facilitator between the Jamaican smugglers and the recipients of the marijuana here in the United States. Gordon was instructed to provide a boat and a boat captain to the smugglers. He was also authorized by the DEA to travel to the United States, in order to liaise with the recipient members of the trafficking operation who were based in south Florida.

Upon arriving in the United States, the DEA provided Gordon with a

recording device, and he was instructed to record all of his telephone conversations with the putative traffickers in south Florida. The Jamaican smugglers had given Gordon phone numbers for two contacts in Florida. One of these contacts was Lawton "Sturdy" Blackwood, who phoned Gordon from a Tampa area code and asked about the marijuana being smuggled in from Jamaica. Gordon subsequently arranged to meet Blackwood at the Coral Square shopping mall in Coral Springs, Florida, on 3 May 2004. The 3 May meeting was recorded, via a hidden recording device on Gordon's person, and was also videotaped via a surveillance platform that the DEA had assembled at the mall. Both the audio and the video recordings of the meeting were later submitted into evidence at trial.

In the meeting, Gordon arrived at the Coral Springs Mall in a minivan, and Blackwood arrived in a BMW, with the appellant, Facey, seated in the passenger seat. Upon arrival, Blackwood exited the BMW and conversed with Gordon inside the minivan for approximately twenty minutes, while Facey remained seated in the BMW. The recording of the meeting, which was subsequently transcribed, demonstrates that Gordon and Blackwood discussed the marijuana that Gordon was seeking to smuggle into Florida. Blackwood stated that he had been advised by his Jamaican contacts that Gordon had some "cheese," and that the Jamaicans

had asked Blackwood whether he could take it. R1-106, Exh. 1 at 7.[1] Gordon asked Blackwood "what kind of market" he had for such a product and Blackwood advised that the market was very good. Id. at 7. Blackwood inquired whether Gordon's product was "high grade," and Gordon stated that it was. Id. at 14. Blackwood stated that he was not prepared to "do anything today," but that he just wanted to "see" Gordon, to "talk to [him]," and to "let [him] meet [Blackwood's] driver," Facey.[2] Id. at 15. He advised that Facey was a "good friend," and indicated that when Gordon was ready to move forward with the transaction Blackwood could instruct Facey to contact him and he would "know what to do." Id. at 15-16. Blackwood also asked Gordon how soon he could have the product, because he "need[ed] to move it by next weekend." Id. at 18.

Approximately 21 minutes into the meeting, Facey entered the minivan and joined Gordon and Blackwood in conversation. After a short introduction, the conversation shifted to the marijuana. Blackwood said "[i]f you give me a container load or truck load then I'll be responsible for that," and Facey stated: "I

---

[1] Gordon, the Jamaican informant, testified at trial that "cheese" referred to marijuana. See R4 at 188. He also testified that the Jamaican dealers used a number of slang words–such as "Reggae Boys," "bush" and "fish"–to refer to marijuana. Id. Clyde Parry, the DEA officer who oversaw this investigation, confirmed that drug traffickers frequently speak in coded words in discussing illicit drugs.

[2] Gordon later testified that at the 3 May meeting Facey had been introduced to him as Blackwood's "driver." See R5 at 35.

4

will take the green [unintelligible]." Id. at 29. Blackwood then reiterated the purpose of the introduction: "I brought this man here. So when . . . [m]e send him down here . . . [y]ou know exactly who you are going to see." Id. at 35-36. Blackwood stated to Gordon that Facey was flexible, because he was in the area. Facey asked Gordon, "[w]hat gonna happen when [lengthy untelligible]?" Id. at 39-40. After Blackwood suggested that he would await Gordon's getting back in touch with them, Facey exited the van and left the meeting, while Gordon and Blackwood remained in the van for further conversation. Id. at 40-41.

Subsequent to this meeting, Blackwood provided Gordon with the fuel money for the boat trip. On 18 June 2004, Gordon transported by boat approximately 668 pounds of marijuana from Jamaica to the United States. After doing so, Gordon placed a phone call to Facey on 8 July 2004; this conversation was also recorded and admitted into evidence. In that conversation Gordon indicated that he had the "fish" and that he was going to "fix it up nice" prior to giving it to Facey. R1-106, Exh. 2 at 2. Gordon indicated that the item was going to be "separate[d]" into "big white sugar bags," and that he was planning on getting it out the next day. Id. In response, Facey stated: "Okay. I'm definitely [going to] have to make preparations." Id. They agreed to communicate the following day, and Facey stated, "[j]ust give me time to go get the proper things,

5

the accommodations[,] and then get back in touch with you." Id. at 3.

The next day, the two again spoke by phone, and Facey indicated that he was awaiting word on "what kind of big van to get." R1, Doc. 130, Gov. Exh. 13B at 2. Facey stated that he also wanted to ascertain from Gordon "what time frame [he was] looking for," and Gordon indicated that he would call Tampa to find out. Id. After this conversation, Facey rented a cargo van under the name of Robert Scarlette. The van was delivered to Gordon.

On 13 July 2004, Gordon, with the assistance of DEA Officer Parry and other DEA agents, loaded the van with marijuana and drove it to an undercover warehouse. Gordon arranged to meet Facey across the street. Once Gordon arrived, Gordon and Facey walked across the street to the warehouse. Facey observed the marijuana in the van, and was apparently upset at the way that marijuana had been packaged; Facey stated, "[i]t can't work like this now." R5 at 38. Gordon had been instructed by the DEA to tell Facey that the van keys were on a shelf in the warehouse. When Facey went to look for the keys, he was arrested. After being read his Miranda[3] rights, Facey waived his rights and stated to DEA Officer Parry that he had been planning on transporting a van load of marijuana. Subsequently, however, Facey modified that statement and indicated

---

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

6

that he had only been planning on picking up and transporting a load of fish. R4 at 78-79.

After his arrest, Facey was charged with one count of conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1)(B) and 846, and one count of attempted possession with intent to distribute 100 or more kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1)(B) and 846. A jury trial was held in February 2006. The jury convicted Facey of the drug conspiracy count, but acquitted him of the attempted possession count. Facey then moved, pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, for a judgment of acquittal on the drug conspiracy charge, arguing that there was insufficient evidence to support his conviction on that count. The district court denied his motion, and Facey was sentenced to 75 months of imprisonment and five years of supervised release.

On appeal, Facey makes two arguments. First, he contends that there was insufficient evidence to support his conviction on the drug conspiracy count, and that, therefore, the district court erred in denying his Rule 29 motion for acquittal. Second, he argues that the transcripts of the recorded conversations that took place during the course of this smuggling operation should not have been provided to the jury without additional safeguards, and that the court's doing so caused him

prejudice. We address each of these contentions in turn.

## II. DISCUSSION

A. <u>Facey's Motion For Judgment of Acquittal / Sufficiency of The Evidence</u>

"We review the denial of a defendant's motion for acquittal <u>de</u> <u>novo</u>." <u>United States v. Perez-Tosta</u>, 36 F.3d 1552, 1556 (11th Cir. 1994) (citations omitted). In considering the sufficiency of the evidence, we view all of the evidence "in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor. <u>United States v. LeCroy</u>, 441 F.3d 914, 924 (11th Cir. 2006). We "cannot reverse a conviction for insufficiency of the evidence unless . . . we conclude that no reasonable jury could find proof beyond a reasonable doubt." <u>United States v. Jones</u>, 913 F.2d 1552, 1557 (11th Cir. 1990) (citation omitted). We keep in mind that "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." <u>United States v. Harris</u>, 20 F.3d 445, 452 (11th Cir. 1994) (citations omitted).

A conspiracy is "an agreement to commit an unlawful act." <u>United States v. Toler</u>, 144 F.3d 1423, 1425 (11th Cir. 1998) (citation and internal quotations omitted). In order to support a conviction for a drug conspiracy pursuant to 21

U.S.C. §§ 841 and 846, the government must prove beyond a reasonable doubt: (1) that an illegal agreement existed to possess with the intent to distribute illegal drugs; (2) that the defendant knew of the agreement; and (3) that the defendant knowingly and voluntarily joined in, or participated in, the agreement. United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002) (per curiam). Once the drug conspiracy has been shown to exist, "a defendant can be convicted even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators." Toler, 144 F.3d at 1428. We have stated, however, that mere presence at the scene of the crime will not support a drug conspiracy conviction; the government must establish, by direct or circumstantial evidence, the defendant's "knowing participation" in the conspiracy. United States v. Villegas, 911 F.2d 623, 627-28 (11th Cir. 1990).

In this case, it is undisputed that a conspiracy existed to import approximately 648 pounds of marijuana from Jamaica. Rather, Facey's appeal hinges on the latter requirements of a conspiracy charge, that is, his "knowing participation" in the conspiracy. See id. First, Facey contends that his presence at the 3 May 2004 meeting between Blackwood and Gordon–in which the trafficking operation was discussed at length–was not enough to prove beyond a reasonable doubt that he "knowingly participated" in the drug conspiracy, because he said very little during

9

the meeting and was not present for a large portion of the discussion. Moreover, Facey contends that none of the subsequent phone calls between Gordon and Facey demonstrate his awareness of, or his knowing participation in, the drug conspiracy. Facey maintains that he was wholly unaware of the contents of the van when he coordinated the meeting with Gordon on 13 July, and that he thought he was transporting fish in the rented cargo van. Accordingly, Facey contends that his Rule 29 motion for acquittal should have been granted.

We disagree. First, with respect to the 3 May meeting at the shopping mall, evidence was presented that tended to establish Facey's knowing participation in the marijuana smuggling operation. Although Facey was not present for the entirety of the conversation in the minivan, Blackwood made clear at the outset that one of the purposes of the meeting was to "let you meet my driver," that is, Facey, so that when Gordon was ready to move forward with the transaction Blackwood could instruct Facey to contact Gordon and Facey would "know what to do." R1-106, Exh.1 at 15-16.

After Facey entered the minivan, the three further discussed the marijuana that was being brought in from Jamaica, referring to it as "Reggae Boy," which Gordon's subsequent testimony established was a slang term for marijuana. Blackwood stated–in Facey's presence–that if Gordon gave him "a container load

10

or truck load then [Blackwood would] be responsible for that," to which Facey interjected: "I will take the green [unintelligible]." R1-106, Exh.1 at 29. Blackwood also reiterated the purpose of the introduction, stating that he had brought Facey to meet Gordon so that when the time came to move the marijuana, Gordon would "know exactly who you are going to see." Id. at 35-36. Before leaving the meeting, Facey asked Gordon what was going to happen, and when. This evidence suggests that Facey knowingly participated in the drug operation. Although he was reticent at times during the discussion, Facey's statements at the meeting suggest that he knew the purpose of the 3 May meeting, and that he was willing to take steps to effectuate its purposes.

Moreover, the evidence of the subsequent phone conversations between Gordon and Facey established that Facey discussed how best to transport Gordon's contraband (after Gordon proposed separating it into large sugar bags). Facey also agreed to make arrangements to secure a van of the appropriate size for Gordon. Finally, Gordon and DEA Officer Parry both testified– and the video surveillance tapes confirmed–that at the July 13 rendezvous, when the marijuana-laden van was ready, Facey arrived at the scheduled time and place, viewed the marijuana in the van, rearranged it to his satisfaction, and was preparing to retrieve the key to the van when he was arrested. This evidence certainly could have led a reasonable

11

jury to find that Facey knowingly participated in the plan to possess and distribute marijuana.

On appeal Facey attempts to analogize his case to our line of "innocent bystander" or "mere presence" cases. In some of those cases, we have reversed drug conspiracy convictions because the evidence failed to establish beyond a reasonable doubt either that the defendant knew that drugs were involved in a particular transaction, see Charles, 313 F.3d at 1284-85; United States v. Sullivan, 763 F.2d 1215, 1219 (11th Cir. 1985), or that the defendant took any steps to participate in or to further the drug conspiracy. See Toler, 144 F.3d at 1433-34. We find, however, that Facey's case is closer to United States v. Lyons, 53 F.3d 1198 (11th Cir. 1995). In Lyons, the defendant was present at an initial meeting in which an undercover agent discussed purchasing crack cocaine from a co-conspirator; the record reflected that the defendant "was well aware of the nature of the transaction taking place," and the co-conspirator made no effort to conceal the nature of the exchange from her. Id. at 1200. Subsequent to that meeting, the defendant in Lyons had traveled to the crack house with her co-conspirator to procure the crack cocaine, and had been present when the crack cocaine was sold to the agent on two separate occasions. Id. at 1200-01. The defendant argued that she had merely been present; that she had not negotiated about the drug prices with

12

the agent; and that she had "contributed nothing to . . . [the] criminal venture."

Id. at 1201.

We disagreed, and affirmed her conviction. First, we noted that while the defendant had been present, and that "mere presence" was not enough, presence at drug trafficking transactions "raise[d] a permissible inference of participation in the drug conspiracy." Id. at 1201; accord United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001) (stating that "presence [] is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme"). Second, we noted that the defendant had been *repeatedly* present at these crack-dealing transactions, and that the co-conspirator had made no effort to hide the drugs from her, or to hide the fact that she was dealing them. Thus, we stated that it "strain[ed] credulity" that the defendant was nothing more than a hapless bystander observing these transactions. Lyons at 1203. In light of these facts, we stated that a jury could have inferred "not only [that she] knew she was present at a drug deal, but that she intended to contribute to the conspiratorial objective." Id. at 1202; see also United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc) ("A jury may find knowledgeable, voluntary participation from presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to

13

be present.").

Similarly, here we find that Facey's reliance on the "mere presence" cases is misplaced. As in Lyons, Facey was not just present at the 3 May meeting between Blackwood and Gordon, but was "presen[t] under a particular set of circumstances," that is, a lengthy discussion about purchasing Gordon's marijuana shipment. See Lyons, 53 F.3d at 1201 (quoting Cruz-Valdez, 773 F.2d at 1546). In addition, as in Lyons, Facey was *repeatedly* present as the conspiracy moved forward–coordinating with Gordon not just at the 3 May meeting but also in subsequent phone calls and at the 13 July rendezvous. And Facey's co-conspirators made no effort to hide the nature of the transaction from him; in fact, they entrusted him with the responsibility of driving a van that had been loaded with 600 pounds of marijuana. See, e.g., Cruz-Valdez, 773 F.2d at 1547 (noting that it is unlikely that "in the course of transporting or distributing millions of dollars of readily marketable marijuana" a smuggler would use "unaffiliated bystanders"). Under Lyons, the evidence adduced at Facey's trial was sufficient to support his conviction for conspiracy beyond a reasonable doubt.

The "mere presence" cases are also inapposite because, as noted previously, Facey did far more than be "merely present"; in fact, he volunteered to help "take the green," R1-106, Exh.1 at 29, he arranged to pick it up in a cargo van (rented in

14

someone else's name), and he seemed comfortable with the contents of the van when he saw that the van was loaded with marijuana. This evidence was more than sufficient, taken together, for a jury to infer that he was a knowing participant in the operation. See, e.g., United States v. Carrazana, 921 F.2d 1557, 1566 (11th Cir. 1991) (stating, where the defendant "plann[ed] the pickup of a large quantity of cocaine," and "execut[ed] the delivery," that a "jury could presume that [the defendant] was familiar with [the illegal acts], and infer his knowledge of the broader, ongoing conspiracy").

In summary, in light of the evidence presented, a reasonable jury could have concluded beyond a reasonable doubt that Facey was aware of the nature of the conspiracy, and that he knowingly participated in it by his conduct.[4] Thus the district court did not err in denying his motion for acquittal.

B. Transcripts of Facey's Recorded Conversations

Facey also argues that the district court erred in allowing into evidence transcripts of the taped audio recordings of his conversations concerning the smuggling operation. Facey's argument on appeal is not, apparently, that the

---

[4] As to Facey's argument that he honestly believed that the van only contained a large shipment of fish, in similar drug conspiracy cases we have stated that a jury is entitled to disbelieve such protestations of innocence in light of other evidence that would support the opposite conclusion. Toler, 144 F.3d at 1430. Such evidence was presented here, and thus a reasonable jury could have found Facey guilty despite Facey's "fish" defense.

15

district court erred in *admitting* the transcripts into evidence, but, rather, that once the transcripts had been admitted, "some safeguards" were needed to ensure that the jury did not use the transcripts improperly during deliberations. Br. of Appellant at 27. Specifically, Facey argues that the district court needed to give a limiting instruction–immediately prior to jury deliberations–to remind the jury that the transcripts were not to be overly relied upon, and that the transcripts were intended to be only corroborative of the audio recordings.

In Facey's case, DEA Officer Parry had prepared a corresponding transcript of each recorded conversation between the confidential informant Gordon, Facey, and the other drug traffickers involved this case. At trial, Officer Parry testified about his method of preparing the transcripts from the audio recordings. He indicated he had transcribed the recordings himself, and that if there were portions that were not understandable, he would put the word "unintelligible" in brackets in the transcription. He also testified that the transcripts were accurate to the best of his ability, and that they accurately captured both the content and the identification of the speakers. When the government sought to introduce the transcript of the 3 May meeting into evidence, Facey's counsel objected. The district court indicated, consistent with its pre-trial ruling on this issue, that it would overrule Facey's objection to the transcripts, subject to a motion to strike the transcripts if the court

16

subsequently determined (in listening to the audio recordings) that they were not

sufficiently accurate.[5]  The court then gave this limiting instruction to the jury:

> I have admitted the transcript for the limited and secondary purpose of
> aiding you in following the content of the conversation as you listen to
> the tape recording and also aid you in identifying the speakers.
> However, you are specifically instructed that whether the transcript
> correctly or incorrectly reflects the content of the conversation or the
> identity of the speakers is entirely for you to determine based upon
> your own evaluation of the testimony you have heard concerning the
> preparation of the transcript and from your own examination of the
> transcript in relation to your hearing of the tape recording itself as the
> primary evidence of its own contents.  And, if you should determine
> that the transcript is in any respect incorrect or unreliable, you should
> disregard it to that extent.

R3 at 78-79.

On the second day of trial, before direct examination of Officer Parry was to

resume, Facey's counsel renewed–outside of the presence of the jury–his objection

to the government's transcripts.  The court reiterated that the transcripts of Facey's

conversations could be admitted:

> I am going to listen along when the tapes are played in front of the
> jury, and if I am satisfied that the transcripts are sufficiently
> accurate–they are not going to be a hundred percent.  I have never
> seen one that's a hundred percent–but if I am convinced that they are

---

[5] The district court had advised, "We will introduce them into evidence subject to a motion to strike if when I listen to the tapes I find that they are not accurate enough to be evidence and that they are only demonstrative.  But we will introduce them into evidence at least as demonstrative exhibits for the jury to be able to follow along with.  And then if you think that they are not accurate enough for the jury to take them back into the jury room, then you can move to strike them . . . as exhibits.  They would still be demonstrative but they wouldn't go back into the jury room."  R3 at 9.

17

sufficiently accurate and authenticated, then I will let them go back to the jury room. If not, then they were just demonstrative aids. And I have already instructed the jury as to their use in that regard.

R4 at 10. The court also advised Facey's counsel that he was free to cross-examine Officer Parry about the transcripts and his methods of preparation, in order to cast doubt on the accuracy of the transcripts. Facey's counsel did, in fact, cross-examine Officer Parry, attempting to cast doubt on his methods of transcribing the tape and his familiarity with Jamaican slang.

Direct examination of Officer Parry then re-commenced. When the government offered into evidence an audio tape and its accompanying transcript of a July 2004 telephone conversation between Gordon and Facey, Facey again objected to the authenticity of the transcript. The court received the transcript with the same limiting instruction that it had given the jury regarding the earlier transcripts. This same process repeated itself a number of times, with Facey's counsel objecting to the transcripts being admitted and the court permitting them to be admitted, subject to its earlier limiting instruction to the jury.

Towards the conclusion of the government's case in chief, the court observed: "[s]o far, I don't see any problem with any of the transcripts. I think the transcripts are among the more accurate transcripts I have ever seen." R4 at 193. The jury was subsequently permitted to take the transcripts of the phone

18

conversations into the deliberations room, along with the audio recordings. Although the district court gave the same limiting instruction to the jury prior to its receiving each individual transcript, no such limiting instruction was given prior to deliberations.

On appeal, Facey argues that "some safeguards" should have been imposed prior to giving the transcripts to the jury, such as a limiting instruction "*immediately prior to deliberations*." Br. of Appellant at 27-29. He contends that the district court's failure to do so created the risk that the jury overly relied on the corroborative transcripts rather than the (more accurate) audio recordings, thereby causing him prejudice. As to the admission of evidence, "[w]e review on an abuse of discretion standard." United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990); see also United States v. Onori, 535 F.2d 938, 947 (5th Cir. 1976).

We have stated that it is a "well-established" rule that a district court may permit a corroborative transcript of an audio recording to be admitted and provided to a jury during deliberations, so as to assist the jury in understanding the original recording. United States v. Reed, 887 F.2d 1398, 1407 (11th Cir. 1989). In Onori, our predecessor circuit explained the purpose behind this rule:

> The need or desire for transcripts arises generally from two circumstances. First, portions of a tape may be relatively inaudible. Second, without the aid of a transcript, it may be difficult to identify the speakers. In either of these cases, it has been said that it is within

19

> the discretion of the trial court to allow a transcript to be used by the jury to assist the jury as it listens to the tape.

> We believe that the use of a transcript as a guide is analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence . . . . They are evidence and, like other evidence, may be admitted for a limited purpose . . . .

535 F.2d 938, 947-48 (citation and internal quotations omitted). We have further indicated that when there is a dispute over the accuracy of a transcript, the proper protocol is for "each side [to] produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its own version or challenging the accuracy of the other side's version." United States v. Hogan, 986 F.2d 1364, 1376 (11th Cir. 1993).

In this case, Facey did not produce his own version of the disputed transcripts, nor did he cast significant doubt on the accuracy of the government's version, other than through a brief cross-examination of Officer Parry. In fact, the record suggests that the transcripts were accurate reproductions of the recorded conversations; Officer Parry testified that they were accurate both as to the content and the identity of the speakers, and the district court found them to be "among the more accurate transcripts [it] [had] ever seen." R4 at 193. In addition, as noted, the district court gave a limiting instruction to the jury–carefully delineating the limited purpose for which the transcripts were to be used–before

20

admitting each one into evidence. That instruction was wholly congruent with the reasoning of <u>Onori</u>.

Moreover, on appeal Facey has failed to show how, if at all, the transcripts were inaccurate; rather, his argument is that the failure to take proper safeguards with the transcripts could hypothetically have led the jury to misuse them, thereby causing him prejudice. This contention is not sufficient to warrant a reversal of his conviction. <u>See, e.g.</u>, <u>Reed</u>, 887 F.2d at 1407 (affirming conviction where defendant "has not questioned the accuracy of the transcripts" but "has asserted only a general claim that he was prejudiced by the jury's alleged use of the transcripts"). In summary, Facey has failed to establish that the district court abused its discretion in admitting the transcripts and providing them to the jury.

### III. CONCLUSION

Facey appealed his drug conspiracy conviction pursuant to 21 U.S.C. §§ 846 and 848, contending: (1) that there was insufficient evidence to support his drug conspiracy conviction and that therefore the district court erred in denying his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c); and (2) that the district court erred in submitting transcripts of recorded conversations to the jury without using additional safeguards to ensure that they were used for a limited purpose. Upon careful review of the record, we conclude

that there was ample evidence from which a reasonable jury could have found

Facey guilty beyond a reasonable doubt on the drug conspiracy conviction, and

that therefore the district court acted properly in denying Facey's Rule 29 motion.

We also find no evidence that the district court abused its discretion in admitting

the transcripts of Facey's recorded conversations and in providing them to the jury

with a limiting instruction.  Accordingly, Facey's conviction is **AFFIRMED.**